885 A.2d 833

Peter Eli ADAMS

v.

STATE of Maryland.

No. 1891, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Nov. 3, 2005.

356

Lisa Sansone (Roland Walker, on the brief), Baltimore, for Appellant.

Steven L. Holcolmb (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for Appellee.

Panel: ADKINS, SHARER, CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (retired, specially assigned).

This appeal's primary contention affords an opportunity to take a long look at *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and to explore several of its more arcane ramifications.

The appellant, Peter Eli Adams, was convicted by a Baltimore City jury, presided over by Judge Kaye Allison, of 1) murder in the first degree and 2) the use of a handgun in the commission of a crime of violence. On this appeal, he raises four questions:

1. Did the State unconstitutionally fail to reveal exculpatory evidence favorable to the defense in violation of *Brady?*

2. Did Judge Allison erroneously fail to reissue a body attachment for Lloyd Jarrett?

3. Did Judge Allison erroneously fail to strike the forelady of the jury when it was revealed that she knew a person in the vicinity of the courtroom who may have had some connection to the case?

4. Did Judge Allison erroneously admit into evidence a tape-recorded statement in violation of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)?

### Brady v. Maryland

The appellant's major contention is that he was denied due process of law under the Fourteenth Amendment when the State unconstitutionally "suppressed evidence favorable to the accused" in contravention of *Brady*. Although the appellant's *Brady* contention is badly flawed, it will serve as an excellent teaching vehicle by negative example.

The *Brady* holding itself had been foreshadowed by the three earlier Supreme Court decisions of 1) *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); 2) *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); and 3) *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). *Mooney; Alcorta*, and *Napue* all dealt either with the knowing use of perjured or false testimony by the State or with the failure of the State to take prompt corrective measures once the use of false testimony became known to it. It was, however, the 1963 decision in *Brady* that announced for the first time a general prosecutorial duty to disclose exculpatory information. The core of the *Brady* holding was:

> We now hold that the *suppression* by the prosecution *of evidence favorable to an accused* upon request *violates due process where the evidence is material* either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87, 83 S.Ct. 1194 (emphasis supplied).

Although *Brady* itself had appeared to condition the entitlement to exculpatory evidence on the defendant's having requested it, the subsequent cases of *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), effectively eliminated the request requirement and imposed upon the prosecution the duty of disclosure regardless of whether there had been 1) a very specific request for certain types of information, 2) a mere generalized request for "all *Brady* material," or 3) no request at all.

We find the *Strickland* formulation of the *Agurs* test for materiality sufficiently flexible to cover the "no request," "general request," and "specific request" cases of prosecutorial failure to disclose evidence favorable to the accused.

*United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. 3375.

It was also in *United States v. Bagley* that the Supreme Court first made it clear that the *Brady* disclosure requirement covered helpful impeachment evidence as well as directly exculpatory evidence on the merits of guilt or innocence.

In *Brady* and *Agurs,* the prosecutor failed to disclose exculpatory evidence. In the present case, the prosecutor failed to disclose evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest. *Impeachment evidence,* however, *as well as exculpatory evidence, falls within the Brady rule. Such evidence is "evidence favorable to an accused,"* so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.

473 U.S. at 676, 105 S.Ct. 3375 (emphasis supplied).

The *Bagley* opinion also stated the standard for determining when allegedly exculpatory evidence is material within the contemplation of *Brady.*

*The evidence is material only if there is a reasonable probability that,* had the evidence been disclosed to the defense, *the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.*

473 U.S. at 682, 105 S.Ct. 3375 (emphasis supplied).

In *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the majority opinion of Justice Souter summarized these post-*Brady* refinements.

In the third prominent case on the way to current *Brady* law, *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), *the Court disavowed any difference between exculpatory and impeachment evidence for Brady purposes,* and it abandoned the distinction between the

second and third *Agurs* circumstances, *i.e.*, the "specific-request" and "general-or no-request" situations. *Bagley* held that *regardless of request, favorable evidence is material,* and constitutional error results from its suppression by the government, *"if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."*

(Emphasis supplied).

*Kyles v. Whitley* further finetuned the test for materiality. *Bagley's* touchstone of materiality is *a "reasonable probability"* of a different result, and *the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict* with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."*

514 U.S. at 434, 115 S.Ct. 1555 (emphasis supplied).

The most recent reaffirmation of *Brady* law by the Supreme Court came in *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

We have since held that *the duty to disclose such evidence is applicable even though there has been no request by the accused* and that *the duty encompasses impeachment evidence as well as exculpatory evidence.* Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

(Emphasis supplied).

Although the Supreme Court's decision in *Brady* was in review of the decision of the Maryland Court of Appeals in *Brady v. State,* 226 Md. 422, 174 A.2d 167 (1961), and although Maryland on three subsequent occasions routinely applied *Brady* law in *State v. Tichnell,* 306 Md. 428, 462–63, 509 A.2d 1179 (1986); *Bloodsworth v. State,* 307 Md. 164, 171–75, 512

A.2d 1056 (1986); and *State v. Thomas*, 325 Md. 160, 190, 599 A.2d 1171 (1992), Maryland's first truly definitive analysis of *Brady* law was the opinion of Judge Raker in *Ware v. State*, 348 Md. 19, 37–48, 702 A.2d 699 (1997).

Two subsequent opinions by the Court of Appeals also discussed and applied *Brady* law. *Wilson v. State*, 363 Md. 333, 346, 768 A.2d 675 (2001), focused on the failure of the State to disclose evidence of a deal or agreement with a witness as the suppression of solid impeachment evidence bearing on the witness's credibility.

Impeachment evidence, as well as exculpatory evidence, is "evidence favorable to an accused."

*The failure to disclose evidence relating to any understanding or agreement with a key witness* as to a future prosecution, in particular, *violates due process, because such evidence is relevant to witness's credibility.*

(Emphasis supplied).

In *Conyers v. State*, 367 Md. 571, 597–98, 790 A.2d 15 (2002), the *Brady* violation similarly consisted of the failure of the State to disclose impeachment evidence affecting a witness's credibility.

*Impeachment evidence, as well as exculpatory evidence, is "evidence favorable to an accused."*

The failure to disclose evidence relating to any understanding or agreement with a key witness as to a future prosecution, in particular, violates due process, because such evidence is relevant to witness's credibility. The Supreme Court explained in *Giglio [v. United States]* that, when the government depends almost entirely on the testimony of a key witness to establish its prima facie case and the witness's credibility, therefore, is an important issue, "evidence of *any* understanding or agreement as to a future prosecution would be relevant to his credibility ...."

(Emphasis supplied).

This Court thoroughly mapped the contours of *Brady* in *DeLuca v. State*, 78 Md.App. 395, 423–36, 553 A.2d 730 (1989)

and *Williams v. State,* 152 Md.App. 200, 831 A.2d 501 (2003). See also *Stewart v. State,* 104 Md.App. 273, 286–88, 655 A.2d 1345 (1995) and *Jones v. State,* 132 Md.App. 657, 672–75, 753 A.2d 587 (2000).

### The Three Key Criteria

*Brady* law establishes three key criteria, each one of which must be satisfied to prove an unconstitutional suppression of exculpatory evidence. The criteria were catalogued by Justice Stevens in *Strickler v. Greene,* 527 U.S. at 281–82, 119 S.Ct. 1936:

> *There are three components of a true Brady violation:* The evidence at issue must be *favorable to the accused,* either because it is exculpatory, or because it is impeaching; that evidence must have been *suppressed by the State,* either willfully or inadvertently; and *prejudice* must have ensued.

(Emphasis supplied). That tripartite test has been one of unfailing utility in Maryland. Two years before the Supreme Court did so in *Strickler v. Greene,* Judge Raker, in *Ware v. State,* 348 Md. at 38, 702 A.2d 699, had already distilled the three-pronged nature of the issue from the more rambling discussion in *United States v. Bagley.*

> To establish a *Brady* violation, the defendant must establish (1) *that the prosecutor suppressed or withheld evidence* that is (2) *favorable to the defense*—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) *that the suppressed evidence is material. United States v. Bagley,* 473 U.S. at 674–78, 105 S.Ct. 3375.

(Emphasis supplied).

The Court of Appeals repeated *Ware's* formulation of the three-pronged test verbatim in *Wilson v. State,* 363 Md. at 345, 768 A.2d 675, and *Conyers v. State,* 367 Md. at 597, 790 A.2d 15. This Court followed suit in *Williams v. State,* 152 Md.App. at 220, 831 A.2d 501.

Applying those criteria to the case at hand, the appellant's claim to have suffered a *Brady* violation depends on his establishing each of the three preconditions:

1. that the evidence that Leon Wilkerson had a subjective expectation of leniency would actually have helped the defense;

2. that, as of the time of the appellant's trial, evidence of Wilkerson's subjective expectation of leniency was known to the State but not to the appellant and was, therefore, suppressed; and

3. that, had the evidence of Wilkerson's expectation of leniency been known by the appellant, there is a substantial possibility that the trial outcome would have been different.

By way of further reduction, the evidence in issue must have been:

1. **HELPFUL,**

2. **SUPPRESSED, and**

3. **MATERIAL.**

Those three criteria give us the analytic framework against which to measure the appellant's primary contention.

### A Shift in Doctrinal Predicates From Newly Discovered Evidence to a *Brady* Violation

Before turning to the first of the criteria, that of whether the evidence in question would actually have been helpful to the defense had it been known, we should first clear away both some doctrinal and factual clutter. The key issue, albeit key, has been only haltingly asserted.

In terms of the evolution of the contention, the appellant's trial concluded on May 23, 2002, when the jury returned verdicts of guilty of first-degree murder and the use of a handgun in a crime of violence. The appellant promptly filed a Motion for New Trial on May 31, alleging what are now the second and third contentions on this appeal. On November 19, the appellant filed an Amended Motion for New Trial, raising for the first time the allegedly newly discovered evi-

dence that "Leon Wilkerson, the only eyewitness in this matter called by the State to testify against the defendant, had an informal understanding with the State for leniency in his pending felony narcotics cases and his pending violation of probation case." There was still no mention of *Brady v. Maryland.*

Judge Allison convened a hearing on the Amended Motion for New Trial on November 21. Extensive argument, based on a convoluted tangle of procedural events, was made by counsel for both sides. Deep into the argument of appellant's counsel on the subject of newly discovered evidence, the specter of *Brady* first arose:

I also believe I'll be able to introduce testimony to show that Mr. Wilkerson was the one who initiated coming forward to the State seeking a plea agreement. And under the February 2000 case that I provided to you of [*Conyers v. State*], even *the act of going and soliciting a deal becomes Brady material.*

(Emphasis supplied).

·Still operating within the context of Maryland Rule 4–331(c) and its limitation that "merely impeaching evidence" will not qualify as newly discovered evidence, Judge Allison probed for that argument's ultimate significance. Defense counsel, out of necessity, then switched the ground for the new trial motion from one based on newly discovered evidence to one based on a *Brady* violation. Judge Allison made an appropriate observation.

THE COURT: All right. The next question I have, Mr. Cole, is assuming after all the dust settles, after all the witnesses testify, after we have this mini trial, that your version of the facts is borne out, how—and *you have told me that you are proceeding under Rule 4–331(c) as to newly discovered evidence—how is this not merely impeaching evidence?*

MR. COLE: ... [I]n *Wilson v. State,* which is March 9th 2001, *whenever a plea agreement either formal or informal is suppressed within the meaning of Brady,* meaning in this

case that Lynn Stewart never made anyone aware of what the understanding was with Mr. Wilkerson, *suppression of any type of understanding formal or informal is a Brady violation.*

And at this stage of where we are here in this proceeding, it's not only proper subject of review for post conviction proceedings, but *it's also a proper subject of review for a motion for a new trial, when it can be shown that evidence favorable to the Defendant was suppressed* during the course, or *prior to, trial actually starting.*

THE COURT: *But you didn't file as to that in a timely manner.*

(Emphasis supplied).

Judge Allison pointed out that a *Brady* issue had not been raised, but generously gave the appellant leave to file an amended new trial motion. She continued the hearing to a later date.

I know that this is a pet peeve of mine, but this proceeding is exactly why this is pet peeve of mine. Rule 4–331A states, *"a motion filed under this rule shall be in writing and shall state in detail the grounds upon which it is based." That has not been done in this case* and you are asking me essentially to conduct a mini trial here on what are very broad allegations under Paragraph 3A of the amended motion for a new trial.

Now, I have permitted you to orally amend that to bring it under 331(c) which is newly discovered evidence. But *now you're telling me that this is really some amalgamation of newly discovered evidence and prosecutorial misconduct.* . . .

I am not having this mini trial. *If you wish to have a hearing on this you're going to have to comply with the rule which is to set out in detail the grounds upon which this proceeding is going to hearing.*

(Emphasis supplied).

On December 19, the appellant filed his Second Amended Motion for New Trial, which formally raised the *Brady* issue

and came on for a hearing on January 21, 2003. The key contention has now become an allegation of a *Brady* violation, raised in the context of a Motion for New Trial based on newly discovered evidence. Judge Allison filed a written Order, denying the Second Amended Motion for New Trial, on July 30, 2004. Accompanying the Order was an eight-page Memorandum, containing both her legal analysis and numerous findings of fact.

### Leon Wilkerson As a "Turncoat" Witness And a Consequential Hearsay Declarant

The evidence that the appellant now claims to have been potentially helpful would have been evidence with which to attack the veracity of the key State's witness, Leon Wilkerson. Between 4:55 P.M. and 5:14 P.M. on November 14, 2001, in the office of Detective Sergeant John Barrick of the Baltimore City Police Department Homicide Unit, Leon Wilkerson gave a statement to Detective Joe Phelps, in the presence of Detective Tom Martin, about the Adams case. The statement was tape-recorded as it was given. The recording was subsequently transcribed by Myrna C. Milburn, of the Administrative Unit of the Criminal Investigation Division, on December 17, 2001. The transcript ran to ten pages.

In that tape-recorded statement, Wilkerson described the circumstances surrounding a fatal shooting that occurred on the evening of December 16, 1998, three years earlier. He unequivocally identified Adams, a known acquaintance of his, as the shooter. He further described how Adams, after the shooting, "ran down Alhambra" Avenue, "down through the alley," and "to my baby's mother's house" at 5206 Craig Avenue.

In his trial testimony on May 21, 2002, six months later, Wilkerson repudiated that identification of Adams as the shooter. He testified that he could not identify the shooter because the shooter was wearing a mask. The State responded by invoking *Nance v. State,* 331 Md. 549, 629 A.2d 633 (1993), and Maryland Rule 5–802.1(a), which on July 1, 1994

essentially codified the holding of *Nance*.[1] Rule 5–802.1(a) provides, in pertinent part:

> *The following statements* previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement *are not excluded by the hearsay rule:*
>
> (a) *A statement that is inconsistent* with the declarant's testimony, *if the statement was* ... (3) *recorded* in substantially verbatim fashion *by ... electronic means* contemporaneously with the making of the statement.

(Emphasis supplied). Judge Allison granted the State's motion and the tape recording of Wilkerson's November 14, 2001, statement to the police was played before the jury as substantive evidence.

Leon Wilkerson's critical change in position made him a classic exemplar of the "turncoat" witness. Such a change in position is a not uncommon trial phenomenon, analyzed at length in *Nance*, 331 Md. at 564–69, 629 A.2d 633, and illustrated by *Makell v. State*, 104 Md.App. 334, 338, 656 A.2d 348 (1995):

> *The Willy Ferguson who showed up at the trial,* however, *was far different from the Willy Ferguson who had assisted* first *the police* and then the grand jury in the course of their investigations. *We may never know why.*

---

1. *Nance* was a watershed decision, undertaking, for the first time in Maryland law, to deal with the problem of the "turncoat" witness. Albeit circumscribed by various guarantees of trustworthiness, earlier inconsistent out-of-court declarations by the "turncoat" witness could, after *Nance*, be received as substantive evidence. The impact of the *Nance* decision was described by this Court in *Makell v. State*, 104 Md.App. 334, 357, 656 A.2d 348 (1995):

   > *Nance* was a broad decision. The *Nance* Court was consciously aware of its wide-ranging repercussions. *Nance* was a bold and express departure from the *status quo*. Maryland abandoned its position as "one of only a handful of states to adhere to the orthodox rule barring use of prior inconsistent statements as probative evidence."

(Emphasis supplied). See also Charles McCormick, "The Turncoat Witness: Previous Statement as Substantive Evidence," 25 *Tex. L. Rev.* 573 (1947).

Why Leon Wilkerson changed his position between November 14 and May 21 is, of course, not controlling. It is the change itself that triggers the rule of *Nance* and of Rule 5–802.1(a). In this regard, we further observed in *Makell v. State*, 104 Md.App. at 345, 656 A.2d 348:

> Neither the *Nance* opinion specifically nor the mainstream of American law that *Nance* deliberately joined care one whit why the testimonial inconstancy comes about. It may be through fear or intimidation. It may be for love or affection. It may be for cold hard cash. It may be because of loss of memory, partial or total, genuine or perjurious, as a result of drugs, alcohol, amnesia, senility, mental retardation, the mere passage of time, or for any other reason. It may be out of sheer perversity. It may be for no reason at all. It may be for reasons unknown. The law's only concern is with *what* happens in this regard, not with *why* it happens.

(Emphasis in original).

Although Rule 5–802.1's provision that such a statement is "not excluded by the hearsay rule" does not expressly spell out whether the non-exclusion is based on the fact 1) that the statement is non-hearsay or 2) that the statement qualifies as an exception to the hearsay rule, the caselaw dispels any analytic ambiguity in that regard. In *Nance* itself, Judge McAuliffe made it clear that the earlier inconsistent statements of the "turncoat" witnesses were indisputably hearsay:

> *The witnesses' ... statement to police ... were hearsay.* That is, they were statements, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted.

331 Md. at 559, 629 A.2d 633 (emphasis supplied). Given, however, the satisfaction of the qualifying conditions, now spelled out by Rule 5–802.1(a), statements, such as the one by

Wilkerson in this case, are admitted as substantive evidence "as an exception to the rule against hearsay":

If there are separate circumstances providing the requisite indicia of trustworthiness concerning the truthfulness of the out-of-court statements, *such statements may be admitted substantively as an exception to the rule against hearsay.*

331 Md. at 560, 629 A.2d 633 (emphasis supplied). See also *Stewart v. State,* 342 Md. 230, 236–37, 674 A.2d 944 (1996); *Sheppard v. State,* 102 Md.App. 571, 576, 650 A.2d 1362 (1994) ("At retrial, the defense will be permitted *to offer the prior inconsistent statements, as exceptions to the rule against hearsay, for their substantive content.*") (Emphasis supplied). In Lynn McLain, *Maryland Evidence* (2d ed. 2001), § 801(1):i, p. 67 n. 9, Professor McLain observes, with respect to the varieties of prior inconsistent statements dealt with by Rule 5–802.1(a):

Under the Md. Rules, *these statements are hearsay, but fall within exceptions to the hearsay rule.*

(Emphasis supplied).

As we now try to pinpoint the appellant's precise *Brady* claim, it is important to note that Leon Wilkerson's damaging inculpatory evidence against the appellant consisted not of Wilkerson's trial testimony on May 21, 2002, but of Wilkerson's hearsay declaration to Detective Phelps on November 14, 2001. The type of evidence that might have been helpful to the appellant and within the coverage of *Brady,* therefore, would have been not those things that might have impeached Wilkerson's testimonial credibility on May 21, 2002, but only those things that might have discredited his hearsay declaration of November 14, 2001. The only sensible strategy would have been for the appellant to attempt to discredit Wilkerson the cooperative declarant, not Wilkerson the "turncoat" witness.

The appellant nonetheless has indiscriminately thrown everything up against the wall to see what may stick. Our first job, therefore, must be one of sorting what would have been a helpful line of attack from what would have been a counterpro-

ductive boomerang. That commits us to an intimidating factual tangle.

## The Facts:

## A Tangled Web

It is invariably a tell-tale sign of a troubled case that it depends on the testimony of too many witnesses describing too many things. This, to a fare-thee-well, is such a case. It is hard to keep moving through the heavy underbrush of intertwined and tangled detail. Involved are three separate prosecutions.

### A. The Adams Case

The appellant's trial we will call the Adams case. The prosecutor of the Adams case was Baltimore City Assistant State's Attorney Frank Rangoussis. Mr. Rangoussis was not involved in any way in either of the other two prosecutions that will be discussed. The Adams case went to trial before Judge Allison in Baltimore City on May 20, 2002, and lasted for four trial days. Leon Wilkerson testified on May 21. The guilty verdict was returned on May 23.

### B. The Wilkerson Case

The appellant's *Brady* claim is that the State suppressed evidence that might have enabled him either 1) to impeach Wilkerson's testimonial credibility or 2) to discredit Wilkerson's hearsay declaration by showing that Wilkerson had several narcotics charges pending against him and that he expected to curry favor with the State by testifying against the appellant or otherwise cooperating with the State.

Wilkerson had been indicted by the Baltimore City Grand Jury on May 21, 2001, on two counts charging the possession of narcotics with the intent to distribute and on various other related counts. He posted bail on those charges and was released from custody. Wilkerson was again indicted by the Baltimore City Grand Jury on October 16, 2001, on two additional charges of the possession of narcotics with the

intent to distribute. He was held without bail on those charges. Wilkerson was also apparently facing charges for having violated probation that had been imposed on an earlier occasion. The prosecutor of all of the Wilkerson cases was Baltimore City Assistant State's Attorney Melissa Copeland. Wilkerson's defense attorney was Daniel Marcus.

Wilkerson was initially scheduled for trial in Baltimore City before Judge William D. Quarles on March 13, 2002. Ms. Copeland obtained a postponement of the trial, ultimately from the administrative judge, when she explained that Wilkerson was in protective custody in Harford County and had not been transported to Baltimore City for trial.

Wilkerson's cases ultimately came to trial before Judge Joseph P. McCurdy, Jr., on June 19, 2002. Wilkerson entered guilty pleas, and Ms. Copeland agreed to a sentence of "time served," which had amounted to one year.

## C. The Poole Case

At approximately the time that the Adams and Wilkerson cases were pending, there was also floating around the Baltimore City State's Attorney's Office an unrelated case for the June 11, 2001 murder of Brian Johnson. In three separate trials, three defendants were ultimately convicted of that murder: Eric Poole, Carl Harrison, and Charles Hamm.[2] We will refer to these trials collectively as "the Poole case." The prosecutor initially assigned to the Poole case was Baltimore City Assistant State's Attorney Lynn K. Stewart. When Ms. Stewart was sworn in as a judge of the Circuit Court for Baltimore City on January 22, 2002, Baltimore City Assistant State's Attorney Cynthia Jones took over the prosecution of the Poole case. In all three trials, Leon Wilkerson, who might well have been an accomplice, was a cooperative and effective

---

**2.** Poole's conviction for first-degree murder was affirmed by this Court in an unreported opinion by Judge Deborah Eyler, filed on October 3, 2003 (No. 2072, September Term, 2002). Harrison's conviction for first-degree murder was affirmed in an unreported opinion by Judge Sharer, filed on February 11, 2004 (No. 2148, September Term, 2002).

witness for the State. He was not himself prosecuted for the murder or for any attendant crime.

## I. HELPFULNESS

### Helpful Impeaching Evidence Necessarily Implies That Successful Impeachment Would Have Been Helpful

Of the three key *Brady* criteria, the most problematic in this case is the question of whether the evidence that was allegedly suppressed would, had it been known, have been **helpful** to the defense. The appellant is perplexingly vague about precisely what evidence in this regard he is talking about. He is equally vague about precisely how that evidence, whatever it may have been, would have been helpful to him. Helpful to do what?

To be sure, the appellant argues that evidence was suppressed that might have assisted him in challenging the veracity of Leon Wilkerson, the "turncoat" witness. Would such evidence, however, have been helpful to the appellant's cause, or might it have been hurtful? It all depends. But first a word about the helpfulness prong itself.

In the archetypal case of *Brady v. Maryland* itself, exculpatory evidence that an accomplice had confessed to having been the triggerman in the murder for which Brady was convicted was unquestionably suppressed. Even if the full content of the suppressed confession had been before he jury, however, it would not in any way have diminished Brady's guilt. It well might have helped him, on the other hand, to avoid the death penalty. Accordingly, the Supreme Court affirmed the decision of the Maryland Court of Appeals in *Brady v. State*, 226 Md. 422, 174 A.2d 167 (1961), to remand for resentencing because of the suppression, but to leave the guilty verdict itself undisturbed. 373 U.S. at 90, 83 S.Ct. 1194. As to it, the evidence would not have been helpful.

*United States v. Bagley*, 473 U.S. at 675, 105 S.Ct. 3375, summarized *Brady's* surgical distinction between 1) an issue

whereon the revelation of the suppressed evidence might have been helpful and 2) an issue whereon the suppression would not have made any difference:

> *The evidence* suppressed in *Brady would have been admissible only on the issue of punishment and not on the issue of guilt,* and therefore could have affected only Brady's sentence and not his conviction. Accordingly, *the Court affirmed the lower court's restriction of Brady's new trial to the issue of punishment.*

(Emphasis supplied).

[1] *Bagley* itself is a good illustration of the principle that the suppression of evidence will not *per se* constitute a *Brady* violation unless the revelation of the suppressed evidence would actually have helped the defendant. Bagley was tried for both narcotics violations and violations of the firearms law. He was convicted of the narcotics charges but found not guilty on the firearms charges.

The prosecution was found to have suppressed evidence that could have impeached the testimonial credibility of "the Government's two principal witnesses at the trial." Although the prosecution had initially represented that the two witnesses had been offered no inducements to testify, it was later revealed that each witness had signed a "Contract for Purchase of Information and Payment of Lump Sum Therefor" and that each witness ultimately received a payment of $300.

It was noted by the trial judge, however, that "[a]most all of the testimony of both witnesses was devoted to the firearms charges," of which Bagley was acquitted. On those charges, he self-evidently needed no further help. On the narcotics charges, by contrast, the testimony of the two witnesses "was relatively very brief" and actually tended to be helpful to Bagley. Indeed, defense counsel "did not seek to discredit their testimony" about the narcotics. 473 U.S. at 673, 105 S.Ct. 3375. The district court had pointed out that as to the only charges that still mattered, the impeachment of the witnesses, therefore, would not have been helpful.

*The answers of O'Connor and Mitchell* to this line of cross-examination *tended to be favorable to respondent.* Thus, *the claimed impeachment evidence would not have been helpful to respondent* and would not have affected the outcome of the trial.

473 U.S. at 673, 105 S.Ct. 3375 (emphasis supplied).

Judge Raker discussed this required component of a *Brady* violation in *Ware v. State,* 348 Md. at 40, 702 A.2d 699, "[T]he defendant must . . . prove that the evidence is favorable to the accused." Judge Harrell similarly observed in *Conyers v. State,* 367 Md. at 606, 790 A.2d 15, "To succeed on a *Brady* claim, Petitioner also must establish that the suppressed evidence was favorable to his defense."

### An Illusive and Chameleon-like Contention

We turn to the question of whether the allegedly suppressed evidence in this case could have been helpful to the defense. Our initial problem is that it is impossible to decide whether the evidence the appellant cites, even assuming it *arguendo* to have been suppressed, would have been helpful to him until we know precisely what he was hoping to do with it. We know, to be sure, that he wanted to attack the veracity of Leon Wilkerson as a source of inculpatory information. We know that that attack consisted of an attempt to show that Leon Wilkerson had some basis for believing that it would be to his advantage to help the State convict the appellant, thereby showing a bias on his part. But which veracity on which occasion was to be attacked? What the appellant still fails to make clear is whether he wanted

**A. TO IMPEACH THE TESTIMONIAL CREDIBILITY OF LEON WILKERSON ON MAY 21, 2002; or**

**B. TO DISCREDIT THE HEARSAY DECLARATION OF LEON WILKERSON ON NOVEMBER 14, 2001.**

The appellant cannot have both. On the key question of who fired the fatal shots, Wilkerson's two utterances are diametrically opposed. The respective veracities are in an inverse proportion to each other. The greater the veracity of

the May 21, 2002, testimony, the less veracious the hearsay declaration of November 14, 2001. The less the veracity of the May 21, 2002, testimony, the more veracious the hearsay declaration of November 14, 2001. The same attack will not be efficacious as to both targets, but the appellant adamantly refuses to pick his target. We are left with no alternative but to pose each target, in turn, as the predicate for this appeal and then to analyze, as to each, whether a successful attack on Leon Wilkerson's particular veracity on that particular occasion would have been helpful to the defense.

## A.   Impeaching Wilkerson as a Trial Witness

A successful impeachment of the testimonial credibility of Leon Wilkerson on May 21, 2002, would not, we hold, have been helpful to the defense. Wilkerson was the only eyewitness to the murder. His sworn testimony that he saw the shooting but could not identify the appellant as the shooter was of critical importance to the defense case. With the jury's only realistic choice being between accepting 1) Wilkerson's trial testimony of May 21, 2002, that he could not identify the shooter; and 2) Wilkerson's hearsay declaration of November 14, 2001, that the appellant was the shooter, the defense needed the jury to go with his trial testimony.

## A1.

### It Was the State, Not the Defense, That Needed to Impeach Wilkerson's Trial Testimony

It was the State, not the defense, that desperately sought to impeach Wilkerson's trial testimony. It ultimately did so, to the appellant's strategic detriment, by introducing Wilkerson's prior inconsistent statement, given to the police in November of 2001. It clearly would not have been helpful to the defense to have impeached more effectively Leon Wilkerson's testimonial credibility on May 21, 2002. For testimonial impeachment purposes, the evidence does not pass the "helpful" test.

Both the value 1) of Leon Wilkerson's trial testimony for, not against, the defense; and 2) of Leon Wilkerson's motive

for testifying as he did were vividly made clear by two letters that he wrote to the appellant, both of which had been turned over to the State by the defense and were introduced into evidence by the State. In the first letter, Wilkerson wrote to the appellant:

> *You or nobody else ever have to worry about me taking the stand and telling.* I will never go against the code and that's everything I love. Trust me and take my word on it. They don't have anything on you .... *You will never have to worry about me testifying. That's against my code. You don't have nothing to worry about.*

(Emphasis supplied).

The second letter from Leon Wilkerson to the appellant stated, in pertinent part:

> *This is the bad news. They is making me take the stand. The good news is* they question me again about the bullshit and *this is what I said* .... I saw a person walking down from Ivanhoe with a gun, snowsuit, mask, and dreads. *They ask me did I see any faces. I told them no and I wasn't sure who it was.* Then *I told them it could've been anybody around there because its about 5 people with dreads* .... After the shooting you was there in the room with Tia with your boxer shorts and T-shirt on. Feel me. It was no way you could've done all this in that short time.

(Emphasis supplied).

Wilkerson closed his letter to the appellant with the reassurance:

> Don't worry, my nigga. *I was never going to take the stand on you in the first place.* I'm going to make it my business that you see the streets.

(Emphasis supplied). That would hardly be a testimonial performance that the State would applaud and consequently reward. That would hardly be a testimonial performance, moreover, that Wilkerson would even believe the State would reward. The appellant still does not identify precisely what it is that he claims Wilkerson actually did because he had been induced to do it.

It was the Assistant State's Attorney who introduced both of these letters, as State's Exhibits Four and Five, as part of the State's successful impeachment of Leon Wilkerson's trial testimony. As a result, the State was permitted to introduce his earlier tape-recorded statement to the police as substantive evidence. The successful utilization of *Nance v. State, supra,* and Maryland Rule 5-802.1(a) is not only testimonial impeachment, it is testimonial impeachment plus. You not only negate hurtful evidence; you get to substitute for it helpful evidence.

This was a testimonial impeachment that was self-evidently helpful to the State. The appellant would have been better off if that impeachment had never taken place and the tape recording of Wilkerson's November 14, 2001 statement to the police had never come into evidence. How the appellant could have been helped by any further impeachment of Leon Wilkerson as a trial witness is inconceivable.

## A2.

### An Inducement Must Actually Induce Something

If, hypothetically, a prosecutor somewhere were to offer a critical witness the most irresistible inducement to testify for the State that the mind of man could imagine, but the witness, heroically, resisted such temptation, there might be a potential *Brady* violation in the mind, or in the heart, of the prosecutor, but there would be no *Brady* violation within the contemplation of the United States Constitution. The most beguiling of seductions is beyond the pale of *Brady,* if it fails to seduce. The siren song of an enchantress is beyond the pale of *Brady,* if it fails to enchant. The wiles of Svengali are beyond the pale of *Brady,* if they fall on resolutely chaste ears.

The entire theory of impeaching credibility by showing a testimonial bias or interest is based upon the notion of a *quid pro quo.* It is not enough that the inducement be offered (or believed to have been offered); an inducement must be acted upon for it to have affected the testimony and, therefore, the verdict. The *quid* is that the witness will cooperate with the

State by testifying in a way that will help the State. The *quo* is that the State will then reward that helpful performance with some favorable treatment, such as a money payment, immunity, a lesser sentence, etc.

There is in this case axiomatic proof that Leon Wilkerson did not testify pursuant to any deal, real or imagined, with the State. The deal would have been one of leniency for Wilkerson at his subsequent narcotics trial in exchange for his testimony **against** the appellant. If that were the contract, the overarching reality is that Wilkerson never performed what would have been his part of the bargain. His testimony identifying the appellant as the shooter was expected to have been a critical part of the State's case. Wilkerson, to the State's dismay, repudiated his earlier statement to the police and testified that he was unable to make the identification. But for *Nance v. State* and Rule 5–802.1(a), his "turncoat" performance could have been fatal to the State's case. It is absurd to suggest that the State later rewarded him for such a miserable failure to perform.

In his argument to Judge Allison at the January 21, 2003, hearing, Mr. Rangoussis, the prosecutor of this Adams case, forcefully stated why he would never have rewarded Leon Wilkerson for testifying as he did.

Let me just say very clearly. I'm the prosecutor. I don't want my witnesses—*I don't want to be impeaching my own witnesses with their prior statements.* I would rather have my witnesses testify consistently.

[I]f I was involved in Wilkerson's case in any fashion, *I would have told the prosecutor, "No, he didn't cooperate." I would have told Copeland, "No, he did not cooperate.* He recanted and *as far as I'm concerned, he didn't tell the truth."* Now, I didn't do that. I had no contact with her because I didn't care what she did on those drug charges.

*No prosecutor in [his] right mind is going to offer a time served binding plea on a recanting witness.*

(Emphasis supplied).

If Wilkerson, moreover, only thought that he had an understanding with the State, it is inconceivable that he would so

recklessly, and to his own certain detriment, have breached it. Without the *quid*, there is no *quo*. There is an *Alice in Wonderland* quality to this entire line of argument. Even assuming an inducement, *arguendo*, to have existed, it did not induce Leon Wilkerson to testify for the State. To suggest that any later leniency shown toward Leon Wilkerson was his reward for having been a "turncoat" witness is absurd.

At this point in our analysis, therefore, all evidence and all arguments offered to show that Leon Wilkerson was somehow induced to testify as a witness for the State on May 21, 2002, become immaterial. Our only remaining concern will be with that evidence and those arguments offered to show that Leon Wilkerson was somehow induced to make a statement to the police on November 14, 2001. Except to the limited extent to which an earlier cause may be inferred from a later effect, most of the events that occurred between November 14, 2001 and May 21, 2002 are self-evidently immaterial as effective catalysts for Leon Wilkerson's behavior on November 14, 2001. Subsequent events cannot rewrite or affect the past.

## B. Discrediting Wilkerson As a Hearsay Declarant

Although the appellant talks the talk of suppressed evidence, had it been known, that would have helped him to impeach the testimonial credibility of Leon Wilkerson, in the last analysis he does not walk the walk. In both brief and oral argument, his thesis is suffused with the *Brady* law language of impeaching testimonial credibility by evidence that, had it not been suppressed, would have shown a special interest on the part of Wilkerson to testify in favor of the State.

What emerges from a closer analysis, however, is that the appellant had neither reason nor desire to impeach the trial testimony of Leon Wilkerson. The thing that hurt the appellant at trial was the hearsay declaration of Leon Wilkerson, the tape-recorded statement that he gave to the police on November 14, 2001. Albeit using *Brady* law language of impeaching the testimonial credibility of a witness, what the

appellant is really trying to do, without saying so in so many words, is to discredit a hearsay declaration.

Once we adjust our focus to this analytically distinct and much narrower issue, possibly one of first impression for *Brady* law, at least one and possibly two flaws appear in the appellant's argument. The possible flaw is a matter of law. The certain flaw is a matter of fact.

## B1.

### We Will Not Expand the Coverage of *Brady*

We look first at the possible legal flaw in the appellant's argument. As the body of constitutional suppression law developed, the early cases of *Brady v. Maryland* and *United States v. Agurs* dealt with the suppression of evidence that was directly exculpatory on the merits of guilt or innocence. In *Brady,* the suppressed confession of a co-defendant would have pointed the finger at someone other than Brady as the shooter. In *Agurs,* the suppressed criminal record of the murder victim would have showed a propensity for violence that could have had a very material bearing on Agurs's claim of self-defense.

It was in *United States v. Bagley* (1985) that the Supreme Court for the first time expanded the coverage of *Brady* to include "evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest." 473 U.S. at 676, 105 S.Ct. 3375. Albeit expanding the coverage, the *Bagley* opinion noted the categorical distinction between "exculpatory evidence" and "impeachment evidence."

> Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule.

473 U.S. at 676, 105 S.Ct. 3375.

Exculpatory evidence is the sort of thing that may be offered by the defense as substantive evidence on the ultimate merits. Impeachment evidence, by contrast, is a more peripheral thing. It may assist the defense in its cross-examination of an adverse witness. It is not, however, exculpatory *per se.*

It is not even relevant until the witness testifies, whereas exculpatory evidence is always relevant.

Thus far in the development of *Brady* law, the coverage has been expanded from the core utility of exculpatory evidence to the more peripheral or collateral utility of impeachment evidence only in the case of evidence that could be used to impeach the testimonial credibility of an actual trial witness. The appellant's use of *Brady* to discredit a hearsay declaration would represent a significant expansion of *Brady* coverage.

In the years since *United States v. Bagley*, a massive body of caselaw has developed, state and federal, dealing with the alleged suppression of impeachment evidence. Indeed, more *Brady* law has dealt with impeachment evidence than with directly exculpatory evidence. Every such case, however, has dealt not with the collateral discrediting of the source of inculpatory evidence generally, but only with **impeaching** the **testimony** of a **witness,** narrowly and specifically. *See Kyles v. Whitley,* 514 U.S. at 433, 115 S.Ct. 1555 ("[T]he Court disavowed any difference between exculpatory and *impeachment evidence* for *Brady* purposes.") (emphasis supplied); *Strickler v. Greene,* 527 U.S. at 280, 119 S.Ct. 1936 ("[T]he duty to disclose ... encompasses *impeachment evidence* as well as exculpatory evidence.") (emphasis supplied). And see *Ware v. State,* 348 Md. at 41, 702 A.2d 699 ("Favorable evidence includes not only evidence that is directly exculpatory, but also evidence that can be used *to impeach witnesses* against the accused")(emphasis supplied); *Wilson v. State,* 363 Md. at 346, 768 A.2d 675 ("The failure to disclose evidence relating to any understanding or agreement with a key *witness* ... violates due process because such evidence is relevant to [the] *witness's credibility.*") (emphasis supplied); *Conyers v. State,* 367 Md. at 585, 790 A.2d 15 ("Did the post conviction court err in finding that the State did not deny Petitioner due process ... by withholding certain material, *impeachment evidence* pertaining to *the testimony of its key witness.*") (emphasis supplied); *Williams v. State,* 152 Md. App. at 219, 831 A.2d 501 ("[W]here the reliability of *a State's witness* is determinative of the defendant's guilt or innocence,

the State's failure to disclose *impeachment evidence* also falls within the *Brady* rule.") (emphasis supplied).

Permeating every statement of the expanded *Brady* disclosure obligation has been the drumbeat repetition of the words "impeach," "witness," and "testimony." "Impeach" is a term of art with specific reference to attacking the testimonial credibility of a witness on the stand being subjected to cross-examination. When one attacks the weight or believability of a hearsay statement, by contrast, one speaks of discrediting it, not of impeaching it. The thing being discredited, moreover, is not testimony. The declarant being discredited is not a witness.

If the appellant is, indeed, asking us to hold that the *Brady* suppression prohibition covers a subjective expectation of leniency in the mind of a hearsay declarant giving a statement to the police, the appellant would be asking us to undertake a massive expansion of *Brady's* coverage. The Supreme Court has been developing *Brady* law for forty-two years and has not ventured into such uncharted territory. It would be an expansion that might plausibly be argued, but it is by no means a logical next step that is necessarily implied.

The unforeseen implications of expanded *Brady* coverage, moreover, could be far-flung. A progressive accretion of *Brady* coverage, taken to the limits of its logic, could lead to an "Open File" policy, an end which the Supreme Court has regularly rejected as a consummation devoutly to be avoided. See *United States v. Bagley,* 473 U.S. at 675 n. 7, 105 S.Ct. 3375 ("[A] rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments.").

The appellant, moreover, does not discuss, or even mention, an expansion of *Brady* coverage beyond the familiar bounds of impeaching a witness's testimonial credibility. He cites neither caselaw nor academic authority in support of such expanded coverage. He seems to operate on the uncritical

assumption that there is no difference between the two phenomena. It is a doctrinal development he would apparently have us forge, *nostra sponte*, to the extent to which he is aware that it would even be a doctrinal development.

It is, however, a will-o'-the-wisp we will not chase. We are dealing with federal constitutional law. If the coverage of *Brady* is to be significantly expanded, it is for the Supreme Court to do so. It is prudent for us to await developments from Washington and not to take it upon ourselves to expand the contours of the Due Process Clause of the Fourteenth Amendment.

Although it would be tempting for us to announce, as an alternative holding, that evidence that might be used to discredit a hearsay declarant does not qualify as "evidence helpful to the accused" within the contemplation and coverage of *Brady*, it is unnecessary for us in this case to go so far. Quite aside from whether the appellant's argument about discrediting the hearsay is flawed as a matter of law, it is definitely flawed as a matter of fact. The resolution of the question of expanded *Brady* coverage beyond testimonial impeachment evidence, therefore, must await another day.

Our observation that *Brady* coverage *per se* has not been expanded to evidence useful for the discrediting of a hearsay declarant may be only of academic significance and not of practical significance. The credibility of a hearsay declarant most definitely may be attacked as a matter of evidentiary law, even if the disclosure of the discrediting evidence has not yet been deemed compellable as a matter of constitutional law. Maryland Rule 5–806 provides, in pertinent part:

> (a) **In general.** When a hearsay statement has been admitted in evidence, *the credibility of the declarant may be attacked,* and if attacked may be supported, *by any evidence which would be admissible for those purposes if the declarant had testified as a witness.*

(Emphasis supplied). See also Federal Rule of Evidence 806; McLain, *Maryland Evidence* (2d ed. 2001), § 806:1. And see

*Watkins v. United States,* 846 A.2d 293, 299 (D.C.App.2004); *United States v. Williams–Davis,* 90 F.3d 490 (D.C.Cir.1996).

Under Rule 5–806, the appellant would have been permitted to attack the credibility of Leon Wilkerson as a hearsay declarant on November 14, 2001. He did not, however, do so.

## B2.

### Inducement, As a Matter of Fact

As we now prepare to venture into a treacherous factual morass, we have the benefit of one narrowing of focus but still are in need of a second fine-tuning. The appellant's central thesis is that Leon Wilkerson possessed an interest or motive for cooperating with the State. The appellant characterizes this interest or motive as an inducement. He claims that, had the State not suppressed evidence of that inducement, he might have been able to persuade the jury to cast a more jaundiced eye on the information coming from Leon Wilkerson.

We have already clarified or narrowed the appellant's contention in one respect. The appellant's effort to discredit the veracity of Leon Wilkerson is necessarily confined to discrediting the veracity of the hearsay declaration Wilkerson gave to the police on November 14, 2001. Nothing with respect to Wilkerson's trial testimony on May 21, 2002 any longer concerns us. The issue is no longer one of possibly false testimony, but only one of a possibly false out-of-court assertion six months earlier.

Even after narrowing the pertinent "effect" at one end of the cause-and-effect sequence, however, there remains the equally troubling problem of narrowing the pertinent "cause" at the other end. The appellant, perplexingly, never tells us precisely what it was that allegedly induced Leon Wilkerson to do whatever it was that the appellant is unhappy about Leon Wilkerson's having done.

At the hearing on the new trial motion, the appellant argued, forcefully, that the State actually had a deal or understanding, formal or informal, with Leon Wilkerson. On

the present appeal, by contrast, he argues only in terms of Leon Wilkerson's having had a subjective expectation of leniency. In this last regard, however, he never makes it clear whether he thinks 1) a merely spontaneous or self-induced expectation of leniency, uninfluenced by any governmental behavior, would be cognizable under *Brady;* or 2) a subjective expectation inferred from ambiguous governmental behavior would be constitutionally cognizable.

As to the nature of the alleged inducement for Leon Wilkerson to have talked to the police, we are confronted with three different and shifting sub-contentions: 1) an actual agreement, formal or informal, with the State; 2) a totally self-induced subjective expectation of leniency; or 3) a subjective expectation of leniency influenced by ambiguous behavior on the part of the State. We have no choice but to deal with each of these possibilities seriatim.

Our examination of whether Leon Wilkerson possessed a *Brady*-cognizable inducement, in any of these three manifestations, to make a statement to the police on November 14, 2001, is extremely fact-specific. It behooves us at this point, therefore, to set out our standard of fact-finding review.

### The Standard of Fact–Finding Review

Stating the controlling standard of review is not a mere ritualistic incantation. The standards of appellate review are first principles of the appellate craft. They are not something that can be invoked when convenient, but also ignored when convenient. They serve not simply as a rationale of decisions; they are determinative of decisions.

As we review the fact-finding of Judge Allison in this case, it is not our job, as a matter of fact, to be persuaded. It is only our job to be satisfied, as a matter of law, that there was competent, to wit, admissible, evidence from which the *nisi prius* fact finder, with the unfettered prerogative to assess credibility and to weigh the evidence, could have been persuaded.

For purposes of this appeal, our factual universe consists only of the evidence offered at that January 21, 2003 hearing and, further tightening the focus, those factual findings actually made by Judge Allison that were not clearly erroneous. It was in this regard that we observed in *Morris v. State*, 153 Md.App. 480, 489, 837 A.2d 248 (2003):

> *The most basic rule of appellate review of fact-finding is that of extending great deference to the fact finder, be it judge or jury.* Appellate judges do not see or hear the witnesses or have the benefit of any sort of non-verbal communication. They are relatively far less able to assess credibility than are the fact finders on the scene. Appellate judges, moreover, are not immersed in the local context and do not get the sometimes inexpressable "feel" of the case. They are relatively far less able to weigh the evidence than are the fact finders on the scene. *The basic rule of fact-finding review, therefore, is that the appellate court will defer to the fact-findings of trial judge or jury whenever there is some competent evidence which, if believed and given maximum weight, could support such findings of fact.* That is the prime directive.

(Emphasis supplied).

As Judge Harrell pointed out for the Court of Appeals in *Conyers v. State*, 367 Md. 571, 600, 790 A.2d 15 (2002), in reviewing the findings of a post conviction court judge with respect to a possible *Brady* violation:

> It is well settled that this Court will not disturb the factual findings of the post conviction court unless they are clearly erroneous.

Judge Raker reaffirmed that appellate deference to the fact-finding of the trial judge on a *Brady* violation in *Wilson v. State*, 363 Md. at 348, 768 A.2d 675. Judge Bloom similarly observed for this Court in *Williams v. State*, 152 Md.App. at 219, 831 A.2d 501:

> At the outset, we reiterate that, in reviewing the denial of a *Brady* claim, *we are required to accept the factual find-*

*ings of the post conviction court unless they are clearly erroneous.*

(Emphasis supplied). See also *In re Tariq A–R–Y,* 347 Md. 484, 488–89, 701 A.2d 691 (1997); *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); and see *Oken v. State,* 343 Md. 256, 299, 681 A.2d 30 (1996); *Gilliam v. State,* 331 Md. 651, 672, 629 A.2d 685 (1993).

To the extent to which, however, Judge Allison may have failed to make a precise finding on some particular sub-issue, if that should be the case, we will then assume that version of the evidence most favorable to the prevailing party, in this case the State. It is in this regard that we turn to the supplemental rule of appellate review, as explained by *Morris v. State,* 153 Md.App. at 489–90, 837 A.2d 248:

*How then does the appellate court . . . fill those fact-finding gaps,* partial or total? What does the appellate court do when there is no fact-finding, or incomplete fact-finding, to which to defer?

*It is here that the supplemental rule of interpretation comes into play.* In determining whether the evidence was sufficient, as a matter of law, to support the ruling, *the appellate court will accept that version of the evidence most favorable to the prevailing party.* It will fully credit the prevailing party's witnesses and discredit the losing party's witnesses. It will give maximum weight to the prevailing party's evidence and little or no weight to the losing party's evidence. It will resolve ambiguities and draw inferences in favor of the prevailing party and against the losing party. *It will perform the familiar function of deciding whether, as a matter of law, a prima facie case was established that could have supported the ruling.*

(Emphasis supplied).

For purposes of this review, other facts and other versions of the evidence simply do not exist. Out of a welter of evidence developed in the course of the trial, some of that evidence still counts. Some, however, no longer counts at all,

simply does not exist for present purposes, and has no business being referred to, unless the appellant is asking us to substitute our judgment for that of the trial judge.

The universe of factual possibilities still available to properly disciplined appellate review is thus only a selective fraction of what was earlier available to the trial judge. Once facts have been found and a ruling has been made, what remains as grist for the appellate mill is no longer the entire trial record, but only a carefully excised slice of that record. We are enjoined to affirm the presumptively correct decision of the trial court whenever it is legally possible to do so.

### B2a.  An Actual Deal, Formal or Informal

In his Second Amended Motion for New Trial of December 19, 2002, and at the hearing on the motion of January 21, 2003, it was clear that the appellant was arguing that the inducement consisted of an actual "deal" between Leon Wilkerson and the State. The appellant acknowledged that the proof of the deal was inferential rather than direct, deducing the cause from the effect. Unequivocally, however, the appellant argued that there was, in fact, a deal. In the Second Amended Motion for New Trial, the appellant expressly made the following allegations:

To any experienced observer of the criminal justice system, the sentences Mr. Wilkerson received for his violation of probation and third and fourth felony narcotics convictions were extraordinary given the facts of his cases, his probationary status at the time of the offenses and his criminal record.... *The sentence becomes understandable,* however, *when one realizes that this individual provided testimony for the State in a murder trial.*

... In examining the results of this investigation *it becomes clear that Mr. Wilkerson had an understanding with the State that in exchange for his cooperation in this case* and other cases, *he would be granted leniency in his own cases.*

*... Ms. Stewart told Mr. Marcus that if Mr. Wilkerson testified consistent with his taped statements, things would work out for him. Mr. Marcus understood this to mean that Mr. Wilkerson would be afforded leniency* in his pending cases if he continued his cooperation by testifying. *He later expressed this understanding to Mr. Wilkerson.*

The transcript of this proceeding clearly shows that the prosecutor in the case at hand had contact with the Assistant State's Attorney prosecuting Mr. Wilkerson about his pending cases. *It also reflects the belief by Ms. Copeland that Mr. Rangoussis intended that Mr. Wilkerson would be given some type of consideration in exchange for his cooperation.... Ms. Copeland demonstrated that Mr. Wilkerson had an understanding with the State for future leniency in exchange for his cooperation.*

The events of June 19, 2002, show that *Mr. Wilkerson was directly rewarded for his testimony in the Adams case.* Furthermore, *this reward was expected and not a gratuitous gesture done after the fact.*

*... [T]he State conveyed to Mr. Wilkerson the idea that his testimony in the Adams case was a necessary part of his ability to escape future punishment for his own pending cases.*

(Emphasis supplied).

The appellant, to be sure, did not argue that he had a formal contract with the State for his cooperation, with all of the details expressly spelled out. His argument at the January 21, 2003, hearing was nonetheless that there was most definitely an agreement with the State, and that the evidence made the inference of such an agreement compelling. At the conclusion of the hearing, his counsel argued forcefully:

Mr. Wilkerson gets exactly what Mr. Marcus told him he was getting all along. Mr. Marcus told Mr. Wilkerson, "Things are going to work out for you. I don't know exactly what it's going to be. You'll be fine. You just need to testify." Well, he testified and, essentially, they gave him the keys to the jail.

*There is absolutely no other way to interpret what happened before Judge McCurdy as other than a reward for his testimony in the Adams case.*

... [D]espite Ms. Copeland's testimony, *her comments* both in March and in June *show quite well that she understood that this benefit was being conferred on Mr. Wilkerson because of his testimony in the case.*

(Emphasis supplied).

There is no ambiguity as to the thrust of that argument. The appellant was not then suggesting that there was a mere subjective expectation of leniency in Leon Wilkerson's mind, albeit arguably one influenced by the behavior of the State. He was arguing that there was an actual bilateral agreement or understanding, formal or informal, between Wilkerson and the State, and no mere unilateral hope or wish-fulfillment fantasy on his part.

In her Opinion and Order, Judge Allison posed the *Brady* issue as it had been presented to her by the appellant.

The defendant's first ground for relief is premised on the factual assertion that *the State failed to disclose* to the defendant, after request, *the State's promise of leniency to Leon Wilkerson,* a State's witness.

(Emphasis supplied). If Judge Allison's ruling and fact-finding was ultimately limited to that issue, that is both understandable and proper, for that was the only issue being urged upon her for decision.

Unfortunately, the entire presentation before Judge Allison on January 21, 2003, both by the appellant and by the State, failed to make any meaningful distinction between a deal or understanding, formal or informal, intended to induce 1) Leon Wilkerson's trial testimony of May 21, 2002, and 2) Leon Wilkerson's hearsay declaration of November 14, 2001. Because, however, the contention, even in that undifferentiated posture, lacks substantiality, we shall look at it initially even as the parties did. We can confidently conclude that there was no *quid,* even without being able to identify precisely what the *quo* was supposed to be.

## (1) Defense Attorney Daniel Marcus

In its effort to prove some sort of deal or understanding between the State and Leon Wilkerson, the defense called four witnesses. The first was Daniel Marcus, the semi-retired lawyer who was appointed on November 16, 2001, to represent Wilkerson on his narcotics related charges. Marcus had a clear memory of almost nothing. His main concern, as he initially considered whether to accept the appointment, was that he "didn't want to take any really complicated cases."

At first, Marcus thought that he had had a conversation with Assistant States Attorney (now Judge) Lynn Stewart, the prosecutor of the three Poole murder cases, and that he heard from her that "things would work out for" Wilkerson if he gave helpful testimony for the State in those cases. On cross-examination, however, he acknowledged that he probably received that assurance, whatever it meant, from the representatives of the Public Defender's Office who were urging him to accept the appointment.

> Q. [W]hen you and I just talked a little while ago outside and I had asked you some questions about your conversation with Judge Stewart and how you came under the impression that "things would work out" for [Wilkerson], *do you remember telling me that you got that impression actually through the Public Defender's Office—*
>
> A. *Yes.*
>
> Q. —either through Ms. Shepherd or through Ms. McGough; is that correct?
>
> A. Yes. Right.
>
> Q. And you also remember telling me that *you weren't exactly sure whether or not Judge Stewart had actually said that to you.* Do you remember that?
>
> A. *That's correct, yes.*
>
> . . . .
>
> *I really can't be sure.* I think—they told me when I took the case, because when they told me he was involved in testimony and there were some murder trials that allegedly

he was involved with, I was a little bit reluctant or hesitant to take it and *I think either Ms. Shepherd or Ms. McGough said, "Dan, don't worry about it."*

Q. *"Don't worry about it. Things will work out"?*

A. *Yes.*

Q. Okay. All right. But *you don't know where they got that impression from?*

A. *No.*

(Emphasis supplied).

Judge Stewart was later called by the State and testified that she 1) had never met with Wilkerson, 2) was unaware that Wilkerson was a witness in the Adams case, and 3) was not even aware that there was an Adams case. She testified, moreover, that she had never spoken to Melissa Copeland, the prosecutor of Wilkerson's narcotics cases, about that or any other case. When asked if she remembered making any offers to Wilkerson, either directly or through his attorney, David Marcus, Judge Stewart testified, "Not only do I not remember, I did not make any offers of leniency to anyone in reference to the Poole, Harrison, and Hamm case." She further swore that she could not "recall any homicide case I've ever handled where I offered any witness anything to testify in the case." She explained that reluctance:

Because I don't. I have not. *I don't offer witnesses anything to testify.* They either do, or they don't. Plus, *you never know what they're going to say when they do testify.* So, I don't. The case is what it is. If the jury believes them, they do. If they don't, they don't.

(Emphasis supplied).

With respect to the inconclusive testimony of Daniel Marcus, Judge Allison found as a matter of fact:

4. Mr. Marcus was contacted by Jane McGough of the Office of the Public Defender in regard to the representation.

5. Mr. Marcus indicated to Ms. McGough that he did not take complicated cases.

9. *Mr. Marcus' memory of the events involving Leon Wilkerson was scant at the time of the hearing* on the Second Motion for New Trial and Mr. Marcus took no notes of the conversation in which State's Attorney Stewart or Public Defender McGough or Public Defender Sheppard made a statement to the effect that "things would work out for Leon Wilkerson."

10. Mr. Marcus made no inquiry of State's Attorney Stewart or State's Attorney Rangoussis as to the meaning of the statement.

11. *A statement by Ms. McGough of the Public Defender's Office that "things would work out for Leon Wilkerson" would be fully consistent with Mr. Marcus' decision to accept representation of Leon Wilkerson* given Mr. Marcus' interest in accepting only cases that were not complicated and that he would not have to take to trial.

12. *Mr. Marcus did not advise Leon Wilkerson of this possible conversation in which someone said words to the effect that "things would work out" for Leon Wilkerson, because Mr. Marcus did not know the meaning of the statement.*

14. At some point in time, Mr. Marcus formed an impression that if Leon Wilkerson testified truthfully for the State that things would work out for him. *When asked how he formed this impression, Mr. Marcus testified "I can't be sure," but he knows the Public Defender's Office led him to form that impression* from the very beginning because he had indicated to them that he would not get involved in a complicated matter.

(Emphasis supplied). Those findings of fact were not clearly erroneous and must, therefore, be accepted by us as the established truth of what happened in this case.

### (2) Assistant Public Defender Jane McGough

The second witness called by the defense was Jane McGough of the Public Defender's Office. When she first

received Leon Wilkerson's criminal file, she realized that she would have to "panel" it out, because Wilkerson was also listed as a possible witness in the Poole murder cases, cases wherein the defendants were being represented by the Public Defender's Office. Ms. McGough spoke with Lynn Stewart, the prosecutor of the Poole cases, who simply said with respect to the appointment of a "panel" attorney, "Give me someone I can work with." Ms. McGough concluded her testimony.

Q. *What*, if any, *knowledge did you have about any plea agreements or understandings* or anything at that time?

A. *I had none. There was no offer*, I don't believe, to Mr. Wilkerson at arraignments, if I remember correctly.

Q. *Did you ever have any other conversations with Lynn Stewart* after you paneled the case to Mr. Marcus?

A. *Not regarding that case.*

(Emphasis supplied).

When Judge Stewart was called as a witness by the State, she testified unequivocally:

*I did not make any offers of leniency to anyone* in reference to the Poole, Harrison, and Hamm case.

(Emphasis supplied).

She testified with respect to Leon Wilkerson specifically:

*[D]id you ever meet with Mr. Wilkerson?*

A. *No.*

Q. So, if I understand correctly, *you never met with him before you left to go on the bench?*

A. *No.*

Q. *To his day, have you ever met him?*

A. *No.*

Q. ... *did you know that Mr. Wilkerson was also testifying in another murder case?*

A. *No.*

Q. Does the name Peter Adams sound familiar to you as any case that you know of that Mr. Wilkerson was involved in?

A. Peter Adams—when I received a summons to appear in court today, the case was *State v. Peter Adams* and I had no idea what it was and, no, *I don't know anything about a Peter Adams.*

Q. *Back in December of 2001, did you know anything about a Peter Adams case?*

A. *No.*

Q. *Did you know that Leon Wilkerson was a witness in the Peter Adams case?*

A. *No.*

(Emphasis supplied).

Judge Stewart also clarified her meaning about preferring as an attorney, "someone you can work with."

Q. Do you recall telling her that you wanted Mr. Wilkerson to be represented by someone you could work with?

A. *I probably did. I probably would have said that.*

Q. What does that mean when you need someone you can work with?

A. Quite frankly, *I didn't want someone who was a blockhead, who wouldn't be reasonable about anything in case I needed to talk to them, or if they wanted to talk to me, it wouldn't be someone who would require a lot of extra, unnecessary stuff.* You don't want me to name names, do you?

Q. No.

A. Okay.

Q. You didn't want someone who would give you a hard time?

A. *I didn't want anyone who would involve themselves in my case unnecessarily when it was none of their business.*

(Emphasis supplied).

With respect to Judge Stewart generally and her conversation with Ms. McGough specifically, Judge Allison found as facts:

**396**

13. *In discussing Leon Wilkerson with Public Defender McGough, State's Attorney Stewart said that she would make no deals with him.*

55. State's Attorney Lynn Stewart prosecuted the Van Pool case, which was the other case in which Leon Wilkerson testified for the State.

56. *State's Attorney Lynn Stewart made no offer to Leon Wilkerson in exchange for his testimony and did not promise him leniency in exchange for that testimony.*

57. *State's Attorney Lynn Stewart was not aware that Leon Wilkerson was testifying in the Peter Adams case.*

58. *State's Attorney Lynn Stewart had no conversation with State's Attorney Copeland regarding Leon Wilkerson's cooperation with the State.*

(Emphasis supplied). Those findings of fact were not clearly erroneous and must, therefore, be accepted as the established truth of what happened in this case.

### (3) Detective Joe Phelps

The defense called as its third witness Detective Joe Phelps, who had taken the statement from Leon Wilkerson on November 14, 2001. His direct examination produced nothing for the defense.

Q. You knew Mr. Wilkerson was incarcerated. *Did Mr. Wilkerson tell you why he was offering information in this case?*

A. *No.*

Q. Did you ask him why he was offering information in this case?

A. Not that I recall.

Q. *Do you recall Mr. Wilkerson asking you for assistance in his pending felony drug cases?*

A. *No.*

. . . .

Q. Do you ever speak to the State's Attorney's Office regarding individual defendants?

A. I never have.

Q. *Did you ever tell Mr. Wilkerson that you would speak to the State's Attorney with regard to his pending cases?*

A. *No, sir.*

(Emphasis supplied).

The cross-examination by the State produced total consistency:

Q. I only have one question. I just want to make sure. *At any time, did you ever offer Mr. Wilkerson anything in exchange for his testimony?*

A. *No.*

(Emphasis supplied).

With respect to Detective Phelps and other members of the police department, Judge Allison made specific findings of fact:

50. Detective Joe Phelps was the lead detective assigned to the Adams case.

51. Prior to charges being brought against Mr. Adams, Detective Phelps interviewed Leon Wilkerson concerning his knowledge of Mr. Adams' involvement in the shooting.

52. *No police officer, including Detective Phelps, offered Leon Wilkerson any leniency, or promised Leon Wilkerson anything in exchange for his testimony in the Adams case.*

53. No police officer, including Detective Phelps, threatened Leon Wilkerson to force him to testify for the State in the trial of Peter Adams.

(Emphasis supplied). Those findings of fact were not clearly erroneous and must, therefore, be accepted by us as the established truth of what happened in this case.

### (4) Leon Wilkerson

The only other witness for the defense was Leon Wilkerson himself. His testimony wandered all over the lot. At one point, he spoke of his initial encounter with Detective Phelps.

Q. Why did you go to the police with that information?

A. Because the police—I spoke with the police and he's like if I can help him, if I can help him with a homicide, he'll see if he can get a deal worked out for me.

Even on direct examination, he soon narrowed what the police had said:

Q. Was any specific promise made to you as to a specific sentence that you would receive?

A. No, they said they couldn't talk to me like that, talk to me. They had to talk to my attorney.

At another point in his testimony, Wilkerson described a different motivation for having identified the appellant as the shooter:

Q. *Why did you tell the police that you had information that Mr. Adams had committed the homicide?*

A. *Because,* at the time, me and Mr. Adams, *we was going through a little disagreement. So I feel if I do that, I would pay him back.*

(Emphasis supplied). That is the version of Leon Wilkerson's testimony most favorable to the State. It is, therefore, the version we must accept as the established truth as to what happened in this case.

On cross-examination, Wilkerson acknowledged that in his statement to Detective Phelps on November 14, 2001, the following exchanges had taken place:

Phelps: Okay, *did anybody force you to talk to us?*

Wilkerson: *No.*

Phelps: And *we make any promises?*

Wilkerson: *No.*

. . . .

Phelps: And you had originally called the Homicide Office and said you wanted to discuss some stuff.

Wilkerson: Yes.

Phelps: Okay—*so everything you discussed it's been voluntary and no one forced you?*

Wilkerson: *Yes.*

Phelps: Promised you anything?

Wilkerson: Yes.

Phelps: Had—*had anybody* promised you—*made any promises to you?*

Wilkerson: *No.*

(Emphasis supplied).

With respect to any of the prosecutors in any of the cases— the cases against Wilkerson himself, the Adams case, or the Poole cases—Wilkerson acknowledged that no prosecutor had ever offered him anything.

Q. Okay. And from my understanding, *no prosecutor ever made any promises to you; is that correct?*

A. *No.*

Q. *You were never under any impression that you were going to receive any leniency from any prosecutor, just from what the police told you; is that correct?*

A. *Yes.*

(Emphasis supplied).

In the course of the January 21, 2003, hearing before Judge Allison, moreover, there were 1) the testimony of Detective Phelps that he had never offered Wilkerson anything; 2) the statements of Frank Rangoussis, the prosecutor of the Adams case, that he never offered Wilkerson anything in exchange for anything; and 3) the testimony of Melissa Copeland, the prosecutor of the case against Wilkerson, that she had never been contacted by the prosecutor of the Adams case or either of the successive prosecutors of the Poole cases to offer Wilkerson anything or to extend to Wilkerson any leniency in exchange for any testimony in their respective cases. With

respect to the Adams case itself, Mr. Rangoussis received the following testimonial replies from Ms. Copeland:

Q. *Were you ever informed by me that you should offer any leniency or anything of that nature to Mr. Wilkerson?*

A. *No.*

Q. Had I—let me back up for a second. *Had any other prosecutor contacted you?*

A. *No.*

. . . .

Q. *Had I at any time asked you to postpone Mr. Wilkerson's case?*

A. *No.*

Q. And *had I ever told you that the case was going to be a stet if he testified?*

A. *No.*

(Emphasis supplied).

Mr. Rangoussis later concluded his examination of Ms. Copeland:

Q. *Had I contacted you to tell you how well Mr. Wilkerson did in his testimony in my case?*

A. *No.*

Q. *Did you have any idea that he recanted his testimony in the case?*

A. *No.*

Q. *Had you known that, would it have made any difference to you?*

A. *No.*

(Emphasis supplied).

In a letter that Leon Wilkerson wrote to his attorney, Daniel Marcus, on April 13, 2002, moreover, Wilkerson expressly disclaimed any deal or understanding to testify in the Adams case. He contrasted the Adams case with the Poole cases, where 1) he claimed that there was a deal for him to testify and 2) wherein he did testify very effectively in favor of the State:

I know I'm suppose to testify sometime next month in 2 cases. *The cases that starts on the 7th of next month [the Poole cases] is the only case that the deal was suppose to be made with or for. If I was to testify in that case alone they would drop all my charges.* The case on the 16th of next month [the Adams case] was only to assure me a bail which they fail to give me.... Now *the case on the 7th of next month I'm testifying on 3 people.* I'm sure about that case, but *the other case I'm not sure about....* [T]he case on the 16th I'm not sure because I really didn't eyewitness him do anything. that's what I mean when I saw I'm not sure, but I will still testify in the case.... [P]lease let them know *my deal was only made to testify in the case on the 7th for both of my charges to be drop. I'm testifying on 3 people in that case.*

(Emphasis supplied).

On the basis of this evidence, Judge Allison made the following findings of fact:

16.  Leon Wilkerson wrote to Mr. Marcus in a letter dated April 13, 2002, asking him to contact the State's Attorneys in the two cases in which he was to testify to clarify the arrangements. *Leon Wilkerson indicated in the letter that he understood that if he testified in another case (case starting on May 7) against three persons that all his charges would be dropped. He also stated* in that letter *that he made no agreement to testify in the Adams case* (case starting on May 16) and did not expect to testify in it.

17.  Except as set forth in the letter referred to in paragraph 16, *Mr. Marcus was not aware of any promise, written or oral, made to Leon Wilkerson in exchange for his testimony in the instant case.*

19.  *Leon Wilkerson never told Mr. Marcus that he had any expectation of leniency in exchange for his testimony in the murder cases, including Mr. Adams' case.*

22. *State's Attorney Rangoussis never offered Leon Wilkerson leniency in exchange for his testimony in the Adams trial.*

29. *State's Attorney Copeland was never told by any prosecutor that Leon Wilkerson had a deal with the State in exchange for his testimony and State's Attorney Copeland was not asked by any prosecutor to offer Leon Wilkerson leniency in exchange for his testimony in the Adams or Van Pool cases.*

31. State's Attorney Copeland knew, from a Detective, that Leon Wilkerson was testifying in the homicide matters "freely," which meant to State's Attorney Copeland that Leon Wilkerson was not looking for any deal from the State in exchange for his testimony.

(Emphasis supplied). Those findings were not clearly erroneous, and must, therefore, be accepted by us as the established truth of what happened in this case.

### (5) Transcript of March 13, 2002, Postponement Hearing

In addition to calling four witnesses, the appellant introduced a series of exhibits, four of which have possible pertinence. We have already quoted from 1) Leon Wilkerson's statement to the police of November 14, 2001, and 2) his letter to his attorney of April 13, 2002. A third exhibit is a transcript of the March 13, 2002, hearing before Judge William D. Quarles in which counsel for both sides requested a postponement of Wilkerson's trial for the narcotics offenses.

Wilkerson was in protective custody in Harford County and had not been brought to court. Assistant States Attorney Melissa Copeland represented to Judge Quarles that Wilkerson was "a witness in a murder trial for Lynn Stewart, now Judge Stewart." The reference was to the Poole murder cases. Ms. Copeland further asserted that Wilkerson "has been very cooperative." Ms. Copeland mistakenly referred to the successor prosecutor to Judge Stewart in the Poole cases as Frank Rangoussis, whereas it was actually Cynthia Jones. The appellant has taken that mistaken reference to Mr. Ran-

goussis as proof that the Adams case, of which Mr. Rangoussis was the prosecutor, was being referred to before Judge Quarles. It was not. It was never referred to.

In her testimony at the January 21, 2003, hearing, Ms. Copeland explained that prior to that hearing before Judge Quarles she had not spoken either to Mr. Rangoussis about the Adams case or to Judge Stewart or Ms. Jones about the Poole cases and that all of her understanding about Wilkerson's having been "cooperative" had come exclusively from her conversation with Daniel Marcus, Wilkerson's attorney, who was himself operating on the basis of nothing but his own assumptions. Ms. Copeland responded to Mr. Rangoussis's examination.

> Q. *Did I ever mention to you that the cases were going to "resolve themselves"?*
>
> A. *No.*
>
> Q. *And I'm [ ] talking about Mr. Wilkerson's cases.*
>
> A. *No.*
>
> Q. *Had any other prosecutor told you that* information that *the cases were going to work out, Wilkerson's cases, or anything to that effect?*
>
> A. *No.*

(Emphasis supplied).

At the hearing, Judge Allison further clarified for herself the fact that all of Ms. Copeland's knowledge about Wilkerson's alleged "cooperation" came exclusively from Daniel Marcus.

> THE COURT: Ms. Copeland, other than Mr. Rangoussis' response to your e-mail and a conversation with a detective where the detective said that Mr. Wilkerson was testifying freely, *do I understand that all of your information about Mr. Wilkerson's cooperation came from Mr. Marcus?*
>
> THE WITNESS: *Yes, Your Honor.*

(Emphasis supplied).

Judge Allison made the following findings of fact:

23. State's Attorney Melissa Copeland was the State's Attorney assigned to prosecute Leon Wilkerson's cases.

24. *State's Attorney Copeland's information about Leon Wilkerson's testimony in the State's murder cases came from Mr. Marcus* when Leon Wilkerson's case # 101141014 was called on December 12, 2001 before Judge Matricciani. *Mr. Marcus indicated to Ms. Copeland that Leon Wilkerson was cooperating in cases involving seven homicides "or so."*

25. *Ms. Copeland was unaware of any conversation Mr. Marcus may have had with State's Attorney Stewart.*

26. *Mr. Marcus had no specific information about Leon Wilkerson's cooperation.*

21. *Mr. Marcus was not present when Leon Wilkerson testified in either of the two cases in which Mr. Wilkerson testified, including Mr. Adams' trial.*

18. *The only conversation Mr. Marcus had with Leon Wilkerson about the murder cases, including Mr. Adams' case, was to advise him to tell the truth.*

32. Leon Wilkerson was not present before Judge Quarles because he had not been transported from Harford County where he was being held in protective custody.

33. At the time of the appearance before Judge Quarles, Mr. Marcus indicated to State's Attorney Copeland that he could not get any information from State's Attorney Stewart about what Leon Wilkerson was to be given for his testimony.

34. At the time of the appearance before Judge Quarles, *State's Attorney Copeland and Mr. Marcus had a discussion in which they agreed that Leon Wilkerson's cases would likely resolve because the State had previously offered him two years and he had been incarcerated for almost one. State's Attorney Copeland indicated this likely outcome on the postponement form.*

35.  *No prosecutor told State's Attorney Copeland that the matters against Leon Wilkerson would likely resolve or should resolve.*

36.  Judge Quarles sent the Leon Wilkerson case to Administrative Court where it was postponed.

(Emphasis supplied). Those findings of fact were not clearly erroneous, and must, therefore, be accepted by us as the established truth about what happened in this case.

### (6) Transcript of June 19, 2002, Guilty Plea

The appellant also introduced before Judge Allison a transcript of Leon Wilkerson's June 19, 2002, appearance before Judge Joseph P. McCurdy, at which Wilkerson entered a guilty plea on the narcotics charges facing him and at which a sentence of time already served was agreed upon. That transcript is the centerpiece of the appellant's entire *Brady* claim. In the Memorandum of Law in Support of the Second Amended Motion for New Trial, the appellant asserted his central thesis:

> [T]he defendant's trial occurred in May, well before *the June 19th bench conference* that *revealed the complete nature of the quid pro quo between Mr. Wilkerson and the State. It is the June 19th transcript which forms the foundation for the defendant's current motion.*

(Emphasis supplied).

Despite all the testimonial protestations by all of the prosecutors in all three concerned cases that there was no deal or understanding, formal or informal, the appellant adamantly insists that there must have been, as a compelled and necessary inference from the lenient sentence that the appellant received from Judge McCurdy.

Judge McCurdy had received no information about Wilkerson's appearances in any other cases—not from Mr. Rangoussis with respect to the Adams case or from Judge Stewart or Ms. Jones with respect to the Poole cases. All he knew was what he heard from Mr. Marcus and Ms. Copeland. The primary concern of all parties was to get Wilkerson to enter a

guilty plea in exchange for a sentence of time-served. Wilkerson's main hang-up was that he wanted to be released that very day, whereas the State wanted to keep him in protective custody until he testified in July in the third of the Poole murder trials.

In explaining that Wilkerson had testified in two murder trials and was still in protective custody pending the third trial, Ms. Copeland repeated her earlier mistaken belief that Judge Stewart had been succeeded, as prosecutor of the Poole cases, by Mr. Rangoussis rather than by Ms. Jones.

> MS. COPELAND: *He testified in a murder trial for— Judge Stewart,* now Mr. Rangoussis. *He is now presently again going to testify in another murder trial that's set for July,* and *he is now being held in Harford County for protective custody. Because he was threatened while he was in the jail population.*

(Emphasis supplied).

Ms. Copeland related that she would have no difficulty with a guilty plea based on a sentence of time served, but that she would like the sentencing to be deferred until Wilkerson's July testimony. There was no indication that the deferral of sentencing was in any way to insure his testimonial performance in July. The concern was exclusively with Wilkerson's safety.

> MS. COPELAND: The State's proposal for the defendant to plead guilty today, we would hold the case sub curia until your last day in this term.

> THE COURT: Uh-huh.

> MS. COPELAND: And *the State wouldn't have any problem with time served.* . . . He wants to go home. I told him he's not going home today.

> THE COURT: *He's going to get killed if he goes home.*

> MS. COPELAND: *Right.* Not only is he going to get killed, he's going back in the population. . . . And he doesn't want any of this now. He wants to go home and become a homicide.

Judge McCurdy was completely amenable to this scheduling.

THE COURT: Well, *suppose we did the plea today and set it for disposition immediately after the other trial?* In other words, I would just say I would pick a date and if it was the wrong date, we could move it up or move it back.

MR. MARCUS: Right.

THE COURT: Because I'm very flexible.

MS. COPELAND: That's the same thing I told him, that we would put it in on that date right after the trial.

THE COURT: Right.

MS. COPELAND: Right. So tell him the only thing is he's staying in Harford County. *If he takes the guilty plea today, he's staying in Harford County. The moment the trial is completed, the moment it's over, he's coming in one or two days afterwards and he's gone.*

THE COURT: *I would even be willing to take it the day the trial was over.*

MS. COPELAND: Right.

THE COURT: You know, *bring him here after it's over with. You know, that's the best I can do because I don't want to cut him loose now—*

THE COURT: *and have him murdered.*

(Emphasis supplied).

Judge McCurdy then engaged in direct conversation with Wilkerson:

THE COURT: Okay. Well, do you want to just try one more time to see if Wilkerson will go with this?

MR. MARCUS: Yes, I'll talk to him now.

MS. COPELAND: Just tell him the judge is willing to take—

THE COURT: I mean, I would even be willing to talk to him up here if you want to bring him up here if he says no.

MR. MARCUS: Mr. Wilkerson.

(Whereupon, Leon Wilkerson, the defendant herein, approached the bench.)

MR. MARCUS: This is Judge McCurdy.

THE COURT: Mr. Wilkerson, *Ms. Copeland told me that* before today *she was offering you*—excuse me—offering, *if you would take a plea today, to have the case scheduled for the end of this term,* which would be the end of August, and have it brought back in, and in the meantime, you would have already been called as a State's witness in another matter, but that you didn't want to do that because you didn't want to stay in jail that long.

And *what I suggested was that I could take your plea and set your disposition for immediately after that trial occurred and then give you time served.*

(Emphasis supplied).

Judge McCurdy was informed of two minor complications: 1) a pending violation of probation and 2) the fact that Wilkerson was on parole. The judge responded:

All right. Well, *I wouldn't be able to do anything with the parole case. I would be able to take Judge Alpert's probation and put it all into one,* what we call a *package deal,* and let you out as soon as the trial was over in the case that you're testifying to, and you would remain in the Harford County jail until that occurred.

The concern is, quite frankly—I mean,—*but my concern is that if you're released before that trial occurs, I'm afraid they are going to kill you.*

(Emphasis supplied).

Although Judge McCurdy could not directly solve the possible parole problem, he did offer to write a letter to the Parole Commissioner:

[A]fter it's over with, it's much less likely that you're going to get hurt because it's over with and harming you isn't going to prevent anything from happening because it has already happened.

And the only thing you would—the only thing that you would have to deal with, and this is going to happen no matter what, is any parole issue that may occur. And *I would even be willing to write you a letter to the Parole Commissioner—that's done by judges—to ask them if they would terminate your parole based upon your behavior.*

MS COPELAND: Based on your cooperation.

(Emphasis supplied).

With those assurances, Wilkerson agreed to a plea of guilty.

THE COURT: *Do you want to do that?*

MS. COPELAND: So it will be all done.

THE DEFENDANT: *I'll do it.*

MS. COPELAND: Okay.

THE COURT: *Okay. All right. We will do that.*

(Emphasis supplied). What followed was the routine entering of two guilty pleas.

In contending that Wilkerson's ultimate sentence was extraordinarily lenient, the appellant, in his Second Amended Motion, makes much of the fact that Wilkerson had been notified that he was facing "mandatory minimum penalties of 25 years without parole."

Due to his status as a twice convicted drug felon, Mr. Wilkerson had been notified that the State was seeking mandatory minimum penalties of 25 years without parole in the event of his conviction.

In her testimony at the January 21, 2003 hearing, however, Ms. Copeland put that notice of mandatory minimum penalties in more realistic perspective.

Q. I mean, didn't you file minimum mandatory penalties with respect to Mr. Wilkerson?

A. *It's policy,* after arraignment court when you do your discovery sheet, *as soon as you walk out of arraignments, if they have one prior possession with intent, we just file it.* Whether or not we call it is our discretion, but *it's part of our policy that* we—the day after arraignment that *we file mandatories and enhanced penalties.*

Q. Do you file that along with your discovery?

A. Yes.

Q. How long have you been in narcotics now, since June of 2001, you said?

A. Yes.

Q. Okay. How many times—how many narcotics cases do you think you've handled since then?

A. *My caseload stays at about 250 cases to 300 cases. I take about 15 cases every docket day.* I'm not certain how many cases I've had.

Q. Well, out of the number of cases, *can you give us a percentage of the defendants that are eligible for these minimum mandatory penalties?*

A. *I'm sure probably 75 percent.*

Q. And *out of the 75 percent that are eligible,* can you tell us *how many of those you've actually sought the minimum mandatory penalty for?*

A. *Zero.*

Q. *Not a single one?*

A. *Not a single one.*

(Emphasis supplied).

Ms. Copeland explained that as early as March of 2002 she had discussed a plea with Daniel Marcus and offered "approximately two years to wrap up all the cases."

Q. And what did Mr. Marcus say?

A. *Mr. Marcus said* that he had been in for a year, you know, *"What about time served?" I said, "Well, two years is enough. I mean, that's a good enough deal."* I said, "We can talk it over with Judge McCurdy. I don't know how much of a problem I'll have between the one year and the two years." *He actually was serving a full one year. If you look at DOC time, the two years would have almost been the equivalent to the one.*

Q. I mean, why would you plead two cases and a drug case to time served? Can you explain it to the Judge?

A. Well, one of the cases, Your Honor, involved a search and seizure warrant when the officers came in. *There were no observed sales prior to any pre-raid surveillance. They just found Mr. Wilkerson, along with Mr. Davis, in the house* and *there was a very weak nexus in that case.*

The second case, Your Honor, that I was given because I had Mr. Wilkerson involved officers seeing Mr. Wilkerson go into a hotel room with a bag of clothes, and when they opened the door, they smelled marijuana. That was a little stronger than the first case. *They weren't the cases of the century. They had their problems and it was pled out.*

Q. Is this something unusual that you would do? *Was this plea an unusual plea, is what I'm asking?*

A. *No.*

(Emphasis supplied).

On cross-examination, Ms. Copeland further explained that an earlier prosecutor in the case had already made an offer of two years for a guilty plea and that the plea arrangement was completely in line with her routine practice.

Q. Is it your testimony that you, given all those circumstances, you felt it was appropriate to release Mr. Wilkerson on the street subsequent to his testimony in the Von Pool case without even being on probation or parole, or without even being placed on supervised probation?

A. *The original offer that was offered by a prior prosecutor also offered two years. When I got the second case, I believed that neither one of them was very strong.* They wanted to put the [Violation of Probation] in. I thought that was something that they did. I was new in the office. I believed that that was something that you-all pulled together for judicial economy and efficiency, and *that plea agreement at the time was right on line with what I had been doing since I had got to narcotics felony.*

(Emphasis supplied).

With respect to the practice of the State's Attorney's Office policy of notifying defendants of possible enhanced penalties for narcotics violations, Judge Allison found the following:

48. *State's Attorney Copeland,* in conformity with her Office's policy, *routinely files the notice of intention to pursue enhanced penalties* for narcotics cases, *but,* as of her testimony at the hearing on the Second Motion for New Trial, *she had never actually pursued such an enhanced penalty.*

49. Approximately 75% of State's Attorney Copeland's cases qualify for enhanced penalties based on a prior criminal record.

(Emphasis supplied).

With respect to the guilty plea generally, Judge Allison found:

42. At the time of the negotiation with Leon Wilkerson before Judge McCurdy, *State's Attorney Copeland believed Leon Wilkerson had testified in the murder cases without the promise of any deal from the State.*

43. *State's Attorney Copeland made the decision to offer Leon Wilkerson a sentence of time-served* for his two cases and pending violations of probation *because the original offer by another prosecutor in* Case # 101141014 *had been two years, she felt neither of her cases were compelling,* and she was inexperienced and believed including the violation of probations in the deal was the accepted procedure.

44. *State's Attorney Copeland's offer was not the result of any offer made by any prosecutor to Leon Wilkerson or any suggestion from any prosecutor to State's Attorney Copeland that leniency would be appropriate.*

(Emphasis supplied). Those findings of fact were not clearly erroneous, and must, therefore, be accepted by us as the established truth about what happened in this case.

### (7) Collective Fact–Finding and Ruling

■ In summing up the case for and against a *Brady* violation, Judge Allison declined to infer from the sentence Leon Wilkerson received on June 19, 2002, any deal or under-

standing to testify for the State and against the appellant on May 21, 2002.

> *There is simply no evidence on which to conclude that the leniency Mr. Wilkerson ultimately received was in exchange for his testimony in the Peter Adams' trial. The defendant's efforts to infer a deal from the outcome on the charges faced by Mr. Wilkerson is unavailing.* In the absence of any other evidence, the circumstances may invite an assumption that the State had an agreement with Mr. Wilkerson. But, in this matter, *there is substantial direct evidence that no such deal ever existed.* Indeed, *had there been any such arrangement, the State would almost certainly have argued that Mr. Wilkerson breached his part of the deal in light of Mr. Wilkerson's efforts* at Mr. Adams' trial *to recant his prior statement* inculpating Mr. Adams in the murder of James Piche.

(Emphasis supplied).

As Judge Allison prepared to make her ultimate ruling, she clearly understood the appellant's *Brady* contention as one that was not confined to the issue of a precise, formal, and detailed contract between Leon Wilkerson and the State, but as one embracing even the inferential "understanding with the State that he would be granted leniency in exchange for his cooperation." Judge Allison posed the issue being argued before her and to be decided by her as one urging a permitted inference of an understanding to be drawn from the mute act of Wilkerson's sentencing itself.

> The defendant's first ground for relief is premised on the factual assertion that the State failed to disclose to the defendant, after request, the State's promise of leniency to Leon Wilkerson, a State's witness. *The defendant argued that because of the lenient sentences received by Mr. Wilkerson* on the narcotics and violation of probation charges pending against him when he testified in the instant matter, *"Mr. Wilkerson must have had an understanding with the State that he would be granted leniency in exchange for his cooperation."*

(Emphasis supplied). That is not an issue confined to a formal contractual deal. It is one embracing an inferential understanding as well.

Judge Allison's final fact-finding and ruling was that no deal or understanding, formal or informal, existed between the appellant and the State.

> *The facts simply do not bear out the defendant's conclusion that Mr. Wilkerson must have had an agreement with the State in exchange for his testimony in the instant case. The most that can be said is that Mr. Wilkerson formed a subjective expectation that he would be granted leniency* in exchange for his testimony in this and another homicide case. . . . *[T]here is no evidence that any prosecutor,* in the homicide cases or the narcotics cases, *promised Mr. Wilkerson anything.* And, even if it could be said that Mr. Wilkerson's letter of April 13, 2002 "got the ball of leniency rolling," *he affirmatively states in that letter that the only thing he expected in regards to the instant case was a bail which he did not receive.* Moreover, the April 13, 2002 letter and Mr. Wilkerson's bail status and expectation of bail were fully explored with him at the Adams trial.

(Emphasis supplied).

Judge Allison was not clearly erroneous, as a matter of fact, and, therefore, was not in error, as a matter of law. As a consequence, the evidence that the appellant claims was unconstitutionally suppressed would not, had it been known to the appellant, have been helpful to him.

### The Trump Card That Need Not Be Played

Because counsel for both parties and the trial judge have dealt with this question of a deal or understanding in its broadest formulation, it has been convenient for us to do the same. The appellant has been permitted to argue on the basis of everything that was said or done by anybody between Wilkerson's arrest on September 26, 2001, and his guilty plea hearing on June 19, 2002, in an effort to prove that there was a deal or understanding for his trial testimony of May 21,

2002. As we have earlier pointed out, however, impeaching Leon Wilkerson's testimonial credibility on May 21, 2002, would not have been helpful to the appellant. The only discrediting that might have been helpful would have been the discrediting of Wilkerson's hearsay declaration of November 14, 2001.

■ If, however, this mass of intertwining and overlapping evidence failed to persuade Judge Allison that any deal or understanding, formal or informal, induced Leon Wilkerson to testify on May 21, 2002, *a fortiori,* a minuscule fraction of that evidence could not conceivably have persuaded her that any deal or understanding induced Wilkerson's hearsay declaration of November 14, 2001.

As of November 14, 2001, there was not yet in the State's Attorney's Office a file on the Adams case. Indictments in that case had not yet been considered, let alone filed. Frank Rangoussis was not yet assigned to the prosecution of the Adams case, nor Melissa Copeland to the Wilkerson case. Lynn Stewart, prosecutor of the Poole cases, was totally unaware of a future Adams case or a future Wilkerson case. Neither the Public Defender's Office nor Daniel Marcus was yet involved in the representation of Wilkerson. No prosecutor or defense attorney was present at, or even aware of, Leon Wilkerson's statement to the police on that day.

The only possible parties to any conceivable deal or understanding that might have induced Wilkerson to make his statement to the police on November 14, 2001, were 1) Wilkerson himself and 2) Detective Joe Phelps. Phelps testified unequivocally that he never offered or promised Wilkerson anything, including any help in making bail. Judge Allison expressly found Detective Phelps's testimony in that regard to have been truthful.

Wilkerson himself never connected his statement to the police of November 14, 2001, to any expectation of leniency, offered or even imagined. He spoke only of a hope of being permitted to make bail, a hope which never materialized. Future leniency, indeed, would seem to have been the furthest

thing from Wilkerson's mind, for as he expressed it in one of his letters to the appellant, "My plan was to post bail and go on the run."

Because the appellant's contention failed to breach even the outer defenses of the State's position that no inducement, even in the larger sense, had been offered, we need not consider in any detail the contention's likely fate before the more impregnable inner citadel of November 14, 2001 standing alone. Even if express fact-finding in this regard were not involved, the supplemental standard of fact-finding review of our taking that version of the evidence most favorable to the State would then be engaged. Judge Allison's ruling would be affirmed on the narrower ground as surely as it is being affirmed on the broader ground.

### B2b. A Purely Self–Induced Expectation of Leniency Is Not A Legally Cognizable Inducement

At the hearing before Judge Allison on January 21, 2003, it was the appellant's position that there was an actual agreement or understanding, formal or informal, express or implied, of testimony in exchange for leniency between Leon Wilkerson and the State. Because Judge Allison's detailed findings of fact essentially foreclosed any hope of success for such an argument, the appellant has shifted his doctrinal ground on this appeal. In his appellate brief the appellant now frames his *Brady* contention exclusively in terms of evidence bearing on his "expectation of leniency."

> THE STATE VIOLATED *BRADY* IN WITHHOLDING EVIDENCE THAT THE STATE'S "EYEWITNESS," *LEON WILKERSON, HAD AN EXPECTATION OF LENIENCY* IN PENDING CHARGES IN EXCHANGE FOR TESTIFYING AT APPELLANT'S TRIAL.

(Emphasis supplied).

Such a subjective expectation of leniency could take two forms. A consideration of the first will not detain us long. That would be an expectation of leniency that was completely self-induced, with no behavior on the part of the State, on that

occasion or on any other occasion, that could somehow be deemed to have led the witness astray. No case, state or federal, has ever come close to considering an expectation of leniency, even if known by the State to exist, to be a *Brady*-cognizable inducement if it is unquestionably nothing more than a wish-fulfillment fantasy, ideational parthenogenesis, a product of spontaneous combustion—like Athena springing fully armed from the brow of Zeus. We do not hesitate to predict that such a totally unilateral subjective state of mind will never be deemed *Brady* material.

### B2c. An Expectation of Leniency Reasonably Based on Appearances

■ The more problematic possibility of a cognizable inducement will occur more frequently. It is one wherein a witness's subjective expectation of leniency is reasonably based on the appearances of governmental behavior, even if the governmental behavior was not intended to produce the expectation. We are not here talking about subtle governmental behavior, intended to convey a message even while maintaining the ability to deny having done so. When the message is both implied by the State and inferred by the witness, there results an actual deal or understanding, albeit an informal and unspoken one. The difference between that and a more formal agreement is simply that the subtle understanding is more difficult to prove. A wink is more ambiguous than a contract.

*Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Ware v. State,* 348 Md. 19, 702 A.2d 699 (1997); and *Conyers v. State,* 367 Md. 571, 790 A.2d 15 (2002), were all cases in which the suppressed evidence would have helped to prove that there actually was a deal made by the prosecution to procure the witness's testimony. *Wilson v. State,* 363 Md. 333, 768 A.2d 675 (2001), was a case in which the suppressed evidence would have revealed the fuller nature of the deal for the witness's testimony.

We are speaking here of a very different phenomenon. It is that of a subjective belief by a witness that some bargain with the State either exists or likely could be arranged, under circumstances in which the State never intended to convey any such message but where its behavior nonetheless made the inference of such an unspoken bargain reasonable. In this situation, there is no deal, formal or informal, express or implied. There is only a subjective expectation of some benefit in the mind of the witness, but an expectation reasonably based upon the State's behavior in other cases on other occasions.

*Williams v. State,* 152 Md.App. 200, 831 A.2d 501 (2003), is an example of just such a phenomenon. A key witness against the defendant was a jailmate, to whom the defendant allegedly confessed his involvement in a murder. It was established that the prosecutor of the murder case entered into no deal or understanding, formal or informal, with the witness. After being convicted, the defendant learned that the witness had been a paid police informant in narcotics cases "for at least ten years," was registered as a confidential informant with a "C.I." number, and had written a series of letters to the trial judge in his own pending case requesting leniency for, among other things, his cooperation with the police in the Williams murder case.

Even though none of this was known to the prosecutor of the murder case, it was known by other members of the State's Attorney's Office and by the police. The knowledge was deemed to be attributable to the prosecutor of the murder case. The failure to have revealed the witness's past arrangements with the State was held to have been a *Brady* violation. Even though the witness in the *Williams* case had no deal, even inferentially, with the State, he nonetheless had an expectation of leniency reasonably based on a pattern of past deals in other cases.

If the appellant is, indeed, now urging such a contention upon us, the quick answer is that it has not been preserved for appellate review. This is not the contention that was made

before Judge Allison on January 21, 2003. For that reason, and that reason alone, Judge Allison made no finding as to a purely subjective expectation of leniency in the mind of Leon Wilkerson. A unilateral expectation and a bilateral deal are two very different things.

Even with respect to the merits of the contention, however, that version of the evidence most favorable to the State would still affirm Judge Allison's ruling. It is simply that Leon Wilkerson had no expectation of leniency in his narcotics cases when he made his statement to Detective Phelps on November 14, 2001. According to his own testimony, all he was hoping for on that occasion was help in making bail.

■ On the less pertinent issue of whether Leon Wilkerson had an expectation of leniency in exchange for his testimony on May 21, 2002, Judge Allison did make two very specific findings of fact.

> 16. Leon Wilkerson wrote to Mr. Marcus in a letter dated April 13, 2002, asking him to contact the State's Attorneys in the two cases in which he was to testify to clarify the arrangements. *Leon Wilkerson indicated in the letter that he understood that if he testified in another case (case starting on May 7) [the Poole case] against three persons that all his charges would be dropped.* He also stated in that letter that *he made no agreement to testify in the Adams case* (case starting on May 16) *and did not expect to testify in it.*

> 19. *Leon Wilkerson never told Mr. Marcus that he had any expectation of leniency in exchange for his testimony in* the murder cases, including *Mr. Adams' case.*

(Emphasis supplied).

On the more pertinent issue of what motivation Leon Wilkerson had for making his statement to the police on November 14, 2001, the best information we have is from one of Leon Wilkerson's letters to the appellant.

> I'm going to explain to you everything. Check this Wootsy! I tried to beat the system but it back fired. They

question me about the bullshit that you're lock up for. *They said if I told them what they wanted they would've gave me a bail. Somebody had already gave them your name and said you done it. What I was doing was adding to the story they had already had. My plan was to post bail and go on the run.*

(Emphasis supplied).

Wilkerson further explained to the appellant how he had reconciled his inconsistent stories to the police:

*They ask me why I indicated your name at first. I told them being as though you was suppose to get me a lawyer and didn't, I took that as if you was saying fuck me, so I said fuck you.* feel me! I told them you owe me a favor and I was expecting it when you gave me your word that you would get my lawyer and you didn't. feel me. *I'm making it seem like I indicated your name in the shit for get backs.* feel me! Now that's what's up. Your lawyer can follow that lead.

(Emphasis supplied).

Even with respect to Leon Wilkerson's cooperation with the police in the Poole cases, the postscript to Wilkerson's letter to the appellant is revealing. There is no indication that Wilkerson implicated the Poole defendants with any expectation of receiving more lenient treatment for his narcotics offenses. The implication is clearly that he would have said nothing to the police if the others involved in that case had not first implicated him, and that he only implicated them in retaliation for their having implicated him. The postscript reads:

Yo them other dudes put me in that other shit. if they would've kept their mouth close they would be still on the streets. When they start there trail?

The bottom line is that Leon Wilkerson had no expectation of leniency that induced him to give his statement to the police on November 14, 2001 (or even to give his trial testimony on May 21, 2002). All of the evidence, therefore, about what various persons said or did to generate such an expectation is immaterial if, as that version of the evidence most favorable to

the State reveals, Wilkerson had no such expectation. For that reason, such evidence, had it been known, would not have been helpful to the appellant.

## II. SUPPRESSION

### Even If Helpful, Was the Evidence Suppressed?

■■■■■ What is suppression? The mere fact that the State is aware of certain information that is not known to the defendant and fails to reveal it is not, *ipso facto*, suppression. Such information has not been suppressed if the defendant, "through reasonable and diligent investigation," could have discovered the information for himself. Judge Raker's description of non-suppression in *Ware v. State*, 348 Md. at 39, 702 A.2d 699, is enlightening.

> [T]he *Brady* rule does not relieve the defendant from the obligation to investigate the case and prepare for trial. *The prosecution cannot be said to have suppressed evidence for Brady purposes when the information allegedly suppressed was available to the defendant through reasonable and diligent investigation. See, e.g., Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir.), *cert. denied*, 519 U.S. 1048, 117 S.Ct. 630, 136 L.Ed.2d 548 (1996). *Brady offers a defendant no relief when the defendant knew or should have known facts permitting him or her to take advantage of the evidence in question or when a reasonable defendant would have found the evidence. See United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995), *cert. denied*, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996); *Barnes v. Thompson*, 58 F.3d 971, 975 (4th Cir.1995) (holding that no *Brady* violation exists when exculpatory evidence is available to the defendant from a source where a reasonable defendant would have looked); *see also United States v. Kelly*, 35 F.3d 929, 937 (4th Cir.1994).

(Emphasis supplied).

■■■■■ Another sometimes overlooked aspect of suppression is the temporal question of when the information in issue ultimately becomes known to the defendant. If the defendant

learns of the information before the conclusion of the trial, to wit, in time to use it, there has been no *Brady* suppression. In *DeLuca v. State*, 78 Md.App. 395, 424, 553 A.2d 730 (1989), this Court discussed the issue of timing.

There is the further problem of what is suppression and when does it occur. *Brady and its progeny deal* not, as here, with discovery sufficiently timely to enable the defense team to calibrate more finely its trial tactics but *with the very different issue of withholding from the knowledge of the jury, right through the close of the trial, exculpatory evidence* which, had the jury known of it, might well have produced a different verdict. *Suppression contemplates the ultimate concealment of evidence from the jury, not the tactical surprise of opposing counsel. The Brady sin is hiding something and keeping it hidden*, not hiding something temporarily in order to surprise someone with a sudden revelation. *Even if the latter were just as sinful, it would be a different sin with a different name.*

(Emphasis supplied). See also *Stewart v. State*, 104 Md.App. 273, 287–88, 655 A.2d 1345 (1995); *Jones v. State*, 132 Md.App. 657, 673–75, 753 A.2d 587 (2000).

In terms of whether the State kept hidden its knowledge of Wilkerson's state of mind and of circumstances possibly bearing on that state of mind or whether the State made such information known before the conclusion of the trial, it is enlightening to look at the State's direct examination of Wilkerson on May 21, 2002. At that point, the trial of the appellant still had two days to run. Wilkerson admitted on direct examination that, even as he was testifying, he had pending against him charges 1) of the possession of marijuana and 2) of possessing cocaine with the intent to distribute. He further admitted that he had been facing felony charges in November of 2001, at the time when he gave a taped statement to the police. He denied, however, that he had made that statement in order to get more lenient treatment on his pending narcotics charges, but asserted that he gave the statement in the hope that it would help him in making bail. He further testified that the appellant was supposed to help

bail him out on the felony charges and that when the appellant failed to do so, Wilkerson became angry with the appellant and decided to go to the police with what he knew about the appellant.

In terms of the appellant's awareness of the circumstances bearing on Wilkerson's possible motivation for cooperating with the State, either in the witness box or in the station house, and of the appellant's timely use of such knowledge, his cross-examination of Wilkerson on the second day of trial is equally revealing. Wilkerson admitted that, on May 21, 2001, he had been indicted for two counts of possessing narcotics with the intent to distribute, two counts of hiring a minor to distribute narcotics, lesser included counts of simple possession, and six counts of conspiracy. He testified that his trial on those charges was scheduled for June 19, 2002, approximately one month after the appellant's trial.

On those charges, Wilkerson had posted bail and been released. He further testified on cross-examination that he was rearrested on October 16, 2001, and subsequently indicted on two additional charges of the possession of narcotics with the intent to distribute. His bail was set at $300,000. He contacted the appellant to help him make bail. When the appellant failed to do so, Wilkerson testified that he felt as if he had been betrayed. Wilkerson testified that he planned "to tell about this [so] I could get my bail lowered." Wilkerson further testified that when he then spoke to the police, he believed that it would help him with his bail.

In the course of being cross-examined, Wilkerson stated that Daniel Marcus was his attorney in the pending narcotics cases. He testified that he had never asked Marcus to pursue any negotiations on his behalf with respect to his appearance at the appellant's trial. He did testify, however, that he had appeared as a State's witness against three other individuals in another unrelated murder case (the Poole case). That trial had been scheduled to begin on May 7, 2002. In the letter from Wilkerson to Marcus, Wilkerson wrote that he believed he had a deal for his testimony in the Poole case.

Wilkerson was also cross-examined by the appellant with respect to a letter he had sent to Marcus. A copy of that letter had been provided to the appellant in pre-trial discovery. In that letter Wilkerson stated to Marcus that he was not sure why he was scheduled to appear at the appellant's trial because "I really didn't eyewitness him do anything."

The appellant had also been apprised by pretrial discovery that the cases pending against Wilkerson had been scheduled for trial on June 19, 2002. On further cross-examination, Wilkerson acknowledged that for the charges against him, he faced maximum penalties ranging up to 40 years, with the possibility of 25 years without the chance of parole. He admitted that he was also facing a charge of violating parole on an earlier 1999 conviction for the possession of narcotics with the intent to distribute.

In her Memorandum and Order denying the appellant's Motion for a New Trial, Judge Allison found as a fact, with specific reference to the letter from Wilkerson to Marcus and its "alert" with respect to the Poole case:

> *The defendant was on notice of the Poole matter from the April 13, 2002 letter that was given him by the State. From that letter, the defendant knew Mr. Wilkerson had charges pending against him and knew he was to testify in another matter.* Further investigation of Mr. Wilkerson's circumstances, if warranted, was possible through review of Mr. Wilkerson's file and through discussion with Mr. Wilkerson's counsel.

(Emphasis supplied).

Leon Wilkerson's legal travails, his possible motivations for any sort of cooperation with the State, and any other tactics or strategies that might have been coursing through his mind were an open book. The appellant knew everything that there was to be known. We hold that, as of the second day of the appellant's four-day trial, he already knew, or with reasonable diligence could have known, all of the information that he now claims was unconstitutionally suppressed. There simply was no suppression of anything.

## III.  MATERIALITY

### Even If Helpful and Even If Suppressed, Was the Evidence Material?

The Alpha and Omega of *Brady* materiality is *United States v. Bagley, supra.* It is not enough that evidence may have been suppressed by the State that would have been helpful to the defense.  It is also required that the evidence, had it been known and used by the defense, would truly have made a difference to the outcome of the case.  There remains the problem of how to measure whether something would truly have made such a difference.

Bagley, on trial for both narcotics and firearms offenses, had made a timely request for evidence of "any deals, promises or inducements made to witnesses in exchange for their testimony."  The Government's response did not reveal any such arrangements.  It was ultimately brought to light, however, that two Government witnesses, "state law-enforcement officers employed by the Milwaukee Railroad as private security guards," had, during the critical investigative period, signed contracts whereby they would be paid by the Government for information furnished to it.  Payments of $300 to each informant were actually made for information furnished in Bagley's case.

The District Court judge, who had heard the case without a jury, nonetheless found that that evidence, even if it had been known by Bagley, would have had no effect on the outcome of the case.  Part of his reasoning was that the testimony of the witnesses bore primarily on the firearms charges, of which Bagley had been acquitted, rather than on the narcotics charges, of which he was convicted.  The witnesses' relatively skimpy testimony on the narcotics charges, moreover, was more helpful than hurtful to Bagley. The Supreme Court summarized the ruling on materiality made by the District Court.

> The District Court found beyond a reasonable doubt, however, that had the existence of the agreements been disclosed to it during trial, the disclosure would have had no effect upon its finding that the Government had proved

beyond a reasonable doubt that respondent was guilty of the offenses for which he had been convicted. The District Court reasoned: *Almost all of the testimony of both witnesses was devoted to the firearms charges in the indictment. Respondent, however, was acquitted on those charges.* The testimony of O'Connor and Mitchell concerning the narcotics charges was relatively very brief. On cross-examination, *respondent's counsel* did not seek to discredit their testimony as to the facts of distribution but rather *sought to show that the controlled substances* in question *came from supplies that had been prescribed for respondent's personal use. The answers of O'Connor and Mitchell to this line of cross-examination tended to be favorable to respondent.* Thus, *the claimed impeachment evidence would not have been helpful to respondent and would not have affected the outcome of the trial.*

473 U.S. at 673, 105 S.Ct. 3375 (emphasis supplied).

The United States Court of Appeals for the Ninth Circuit, however, reversed the District Court, taking a very stern look at what it deemed to be a *Brady* violation. *Bagley v. Lumpkin,* 719 F.2d 1462 (1983). It held that the suppression of the information was error *per se* and that it would call for an automatic reversal, unless it could be deemed to have been harmless error. The Supreme Court, in turn, reversed the Ninth Circuit, disdaining automatic reversals and holding that actual materiality is still the critical issue that must be measured on a case by case basis.

The holding in *Brady v. Maryland requires disclosure only of evidence that is favorable to the accused and "material* either to guilt or to punishment." The Court explained in *United States v. Agurs:* "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is *a concern that the suppressed evidence might have affected the outcome of the trial."*

473 U.S. at 674–75, 105 S.Ct. 3375 (emphasis supplied).

The *Bagley* opinion, 473 U.S. at 677, 105 S.Ct. 3375, quoted with approval from *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972):

*We do not automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict...."* A finding of materiality of the evidence is required under *Brady* .... A new trial is required if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury...."

(Emphasis supplied).

Indeed, *United States v. Agurs,* 427 U.S. at 109–10, 96 S.Ct. 2392, had earlier noted:

[T]here is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality"* in the constitutional sense.

(Emphasis supplied).

## A Measuring Rod for Materiality

[13]   But where on the continuum of increasing likelihood is the line to be drawn between a merely long shot at a change in the verdict and a change worth betting on?   The *Bagley* opinion found in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the appropriate measuring rod for materiality.

*The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.   A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.*

473 U.S. at 682, 105 S.Ct. 3375 (emphasis supplied).

It is critically important to note that *Bagley,* just as *Strickland* before it, did not use the unadorned noun "probability" in its mathematical sense of meaning "more likely than not" or "50 percent plus."   *Bagley* provided its own definition for the full phrase "reasonable probability" as "a probability sufficient

to undermine confidence in the outcome." The Supreme Court remanded the case to the Ninth Circuit so that it might determine "whether there is a reasonable probability that, had the inducement offered by the Government ... been disclosed to the defense, the result of the trial would have been different." 473 U.S. at 684, 105 S.Ct. 3375.

*Strickland* had been measuring the likely prejudice to the defense resulting from the ineffective assistance of counsel. *Strickland* first rejected a standard, suggested by the defense, that was too low:

> *It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.* Virtually every act or omission of counsel would meet that test, and *not every error that conceivably could have influenced the outcome undermines the reliability of the result* of the proceeding. Respondent suggests requiring a showing that the errors "impaired the presentation of the defense." That standard, however, provides no workable principle. *Since any error, if it is indeed an error, "impairs" the presentation of the defense, the proposed standard is inadequate* because it provides no way of deciding what impairments are sufficiently serious to warrant setting aside the outcome of the proceeding.

466 U.S. at 693, 104 S.Ct. 2052 (emphasis supplied).

*Strickland* then rejected, as too high, the standard of more-likely-than-not:

> On the other hand, we believe that *a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case.* This outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in criminal proceedings. Moreover, it comports with the widely used standard for assessing motions for new trial based on newly

discovered evidence. Nevertheless, *the standard is not quite appropriate.*

466 U.S. at 693–94, 104 S.Ct. 2052 (emphasis supplied).

Having rejected, with Goldilocks, both that which was too high and that which was too low, *Strickland* then settled on that which was "just right."

> *The defendant must show that there is a reasonable probability that,* but for counsel's unprofessional errors, *the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.*

466 U.S. at 694, 104 S.Ct. 2052 (emphasis supplied).

The *Strickland* opinion analyzed why the preponderance of evidence standard, albeit appropriate for measuring the impact of newly discovered evidence in the context of a motion for a new trial,[3] is not appropriate for measuring prejudice in an ineffective assistance of counsel case and, now by analogy, for measuring materiality in a *Brady* suppression case.

> Even when the specified attorney error results in the omission of certain evidence, *the newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims* presupposes that all the essential elements of a presumptively accurate

---

3. Maryland, however, is an exception to what *Strickland* characterized as "the widely used standard for assessing motions for new trial based on newly discovered evidence." 466 U.S. at 694, 104 S.Ct. 2052. In *Yorke v. State*, 315 Md. 578, 586–88, 556 A.2d 230 (1989), Judge Orth wrote for the Court of Appeals in rejecting the higher or "probable" standard for measuring likely impact and opted for an intermediate standard:

> The newly discovered evidence may well have produced a different result, that is, there was *a substantial or significant possibility* that the verdict of the trier of fact would have been affected.

315 Md. at 588, 556 A.2d 230 (emphasis supplied).

Ironically, that language from a newly discovered evidence case is the very language that *Bowers v. State*, 320 Md. 416, 427, 578 A.2d 734 (1990), would adopt for measuring prejudice in ineffective assistance of counsel cases and that *State v. Thomas*, 325 Md. 160, 190 n. 8, 599 A.2d 1171 (1992), would adopt for measuring *Brady* materiality.

and fair proceeding were present in the proceeding whose result is challenged. An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so *finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable,* and hence the proceeding itself unfair, *even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.*

466 U.S. at 694, 104 S.Ct. 2052 (emphasis supplied).

*Strickland* also provided guidelines for making the quantitative assessment. One is that the likely result must be assessed only in contemplation of a fully principled verdict.

In making the determination whether the specified errors resulted in the required prejudice, *a court should presume,* absent challenge to the judgment on grounds of evidentiary insufficiency, *that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker,* even if a lawless decision cannot be reviewed. *The assessment* of prejudice *should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.* It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.

466 U.S. at 694–95, 104 S.Ct. 2052 (emphasis supplied).

A second important guideline is that, in assessing the impact of a trial strategy or a piece of evidence on the verdict, the case must be viewed as a whole.

In making this determination, *a court* hearing an ineffectiveness claim *must consider the totality of the evidence before the judge or jury.* Some of the factual findings will have been unaffected by the errors, and factual findings that

were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, *a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.*

466 U.S. at 695–96, 104 S.Ct. 2052 (emphasis supplied).

Although *Kyles v. Whitley,* 514 U.S. at 433–38, 115 S.Ct. 1555, provided an illuminating discussion of *Bagley's* materiality standard, both it and *Strickler v. Greene, supra,* routinely recited the *Bagley* standard without change. Of pertinence to our present discussion of the quantitative aspects of the phrase "reasonable probability," however, is the observation in *Kyles v. Whitley,* 514 U.S. at 434, 115 S.Ct. 1555:

> *The question is not whether the defendant would more likely than not have received a different verdict* with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

(Emphasis supplied).

*Strickler v. Greene* also added a wrinkle by providing a good illustration of the difference between a "reasonable **possibility**" of a different result, which is not enough to be deemed material, and a "reasonable **probability**" of a different result, which is.

> The District Court was surely correct that there is a *reasonable possibility* that either a total, or just a substantial, discount of Stoltzfus' testimony might have produced a different result either at the guilt or sentencing phases.... As the District Court recognized, however, petitioner's bur-

den is to establish a *reasonable probability* of a different result.

527 U.S. at 291, 119 S.Ct. 1936 (emphasis in original).

The Supreme Court's opinion recognized that, had the impeaching material been made known to the defense, the "discrediting [of the State's witness's] testimony might have changed the outcome of the trial," but that that quantum of likelihood, to wit, a possibility, was not enough to qualify as "material."

> Without a doubt, Stoltzfus' testimony was prejudicial in the sense that it made petitioner's conviction more likely than if she had not testified, and *discrediting her testimony might have changed the outcome of the trial.*
>
> *That, however, is not the standard that petitioner must satisfy* in order to obtain relief. He must convince us that "there is a reasonable probability" that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.

527 U.S. at 289, 119 S.Ct. 1936 (emphasis supplied).

Because the appellant in *Strickler v. Greene* had shown only the *reasonable possibility* of a different result, rather than a *reasonable probability,* the Supreme Court held that the evidence allegedly suppressed was not material and that *Brady,* accordingly, had not been violated.

> Petitioner has satisfied two of the three components of a constitutional violation under *Brady:* exculpatory evidence and nondisclosure of this evidence by the prosecution.... However, *petitioner has not shown that there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed.* He therefore cannot show materiality under *Brady.*

527 U.S. at 296, 119 S.Ct. 1936 (emphasis supplied).

But for the linguistic tweaking of substituting one synonymous phrase for another, which we will examine more fully, the Court of Appeals opinions have faithfully echoed the Supreme Court opinions in applying *Bagley's* materiality stan-

dard for an alleged *Brady* violation. *See Ware v. State,* 348 Md. at 47, 702 A.2d 699 ("[A] showing of materiality does not require the accused to demonstrate by a preponderance of the evidence that the disclosure of the suppressed evidence would have resulted in an acquittal."); *Wilson v. State,* 363 Md. at 351–56, 768 A.2d 675; *Conyers v. State,* 367 Md. at 609–13, 790 A.2d 15.

Even if, *arguendo,* the evidence of Leon Wilkerson's subjective expectation of leniency had been suppressed and even if, *arguendo,* it might have been helpful to the appellant, it was not material within the contemplation of *Brady* and *Bagley.* Taking the non-clearly-erroneous fact-findings of Judge Allison and making our own independent judgment as to their significance, we conclude that there was not a substantial possibility, to wit, a reasonable probability, that the jury's knowledge of such evidence would have produced a different verdict.

### A Prescient Choice of Synonyms

A further word, however, about nuances of vocabulary. For measuring the materiality of suppressed evidence, the Supreme Court in *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375, used the words "reasonable probability," adopting the standard from the *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) materiality test for ineffective assistance of counsel cases. The Supreme Court has consistently continued that usage in its subsequent cases. *Kyles v. Whitley,* 514 U.S. at 434, 115 S.Ct. 1555; *Strickler v. Greene,* 527 U.S. at 280, 119 S.Ct. 1936.

Judge Karwacki, however, in *State v. Thomas,* 325 Md. 160, at 190 and n. 8, 599 A.2d 1171 (1992), explained that Maryland, in applying the *Strickland v. Washington* materiality test, had used "substantial possibility" as a synonym for the Supreme Court's "reasonable probability" and would continue to do so in measuring the materiality of a *Brady* violation. Succeeding Maryland cases have continued the custom. *Ware v. State,* 348 Md. at 45–46, 702 A.2d 699; *Wilson v. State,* 363 Md. at

352, 768 A.2d 675; *Conyers v. State,* 367 Md. at 611, 790 A.2d 15.

At first glance, the tilt, one way or the other, may seem Lilliputian. In terms of linguistic gamesmanship, the noun "possibility" pumps less testosterone than "probability." Advantage, defendant! On the other hand, the adjective "substantial" packs more punch than "reasonable." Advantage, State! At the end of the day, the scales would seem to be in equilibrium. Quantitatively, the two terms are indistinguishable down to the last decimal place. It would be tempting to say, "It's a wash."

In purely quantitative terms, it may, indeed, be a wash, but qualitatively the substitution of terms may serve a valuable purpose. In *Bowers v. State,* 320 Md. 416, 578 A.2d 734 (1990), an ineffective assistance of counsel case, Judge William Adkins pointed out, with respect "to Strickland's prejudice prong," that "many decisions apply the Supreme Court's 'reasonable probability' language without any particular attempt to define the term with more precision." *Bowers* looked to the terminology developed to describe the impact of newly discovered evidence in *Yorke v. State,* 315 Md. 578, 588, 556 A.2d 230 (1989), and concluded that *Yorke's* use of the term "substantial or significant possibility" was an efficacious way of describing precisely that quantum of likelihood that *Strickland* had labeled a "reasonable probability."

"Substantial possibility," of course, is the term we used to define the "may well" standard we adopted in *Yorke. We think the standard, as so defined, aptly describes the prejudice standard* the Supreme Court adopted *in Strickland.* We shall apply it in this case.

320 Md. at 427, 578 A.2d 734 (emphasis supplied). Two years later, *State v. Thomas,* 325 Md. at 190 n. 8, 599 A.2d 1171, adopted the same terminology as a more appropriate way of describing the materiality of a *Brady* suppression.

Thus, "substantial possibility," meaning the same thing in all three contexts, is now Maryland's common denominator measuring rod for assessing 1) the likely impact of newly

discovered evidence in the context of a new trial motion, *Yorke v. State*, 315 Md. at 588, 556 A.2d 230 2) the likely prejudice in an ineffective assistance of counsel case, *Bowers v. State*, 320 Md. at 427, 578 A.2d 734; and 3) the materiality of a *Brady* suppression of helpful evidence, *State v. Thomas*, 325 Md. at 190 n. 8, 599 A.2d 1171.

Maryland, of course, was free to adopt any standard it pleased for newly discovered evidence cases. It did so in *Yorke v. State*. In both the ineffective assistance of counsel cases and the *Brady* materiality cases, on the other hand, the Maryland standard is precisely the standard dictated by the Supreme Court. It has to be, for in such cases we are applying federal constitutional law, not Maryland law. There is no quantitative difference between the Maryland standard and the federal standard. The only difference is in the linguistic labels the two jurisdictions have chosen to place upon that same immutable standard.

"Reasonable probability" and "substantial possibility" are synonyms. That does not mean, however, that one synonym may not enjoy advantages over the other. An obvious weakness of the term of art "reasonable probability" is that the unwary reader may readily confuse it with the informal and commonplace notion of "probability." To the untutored ear, probability sounds like something that is more likely true than not. As we have analyzed at length, however, in tracing the development of *Strickland's* prejudice standard and its adoption for *Brady* materiality measurements by *United States v. Bagley*, "reasonable probability" implies no such thing. When the term is comfortably surrounded by its full entourage of interpretative caselaw, its more limited meaning is clearly understood. The difficulty, of course, is that the phrase, as years go by, will be inevitably ripped loose from its supportive caselaw. Left on its own, it can easily, albeit mistakenly, be taken to mean more likely than not. The phrase "substantial possibility" suffers no such risk of mistaken identity. It is, therefore, a less treacherous synonym.

Indeed, in his concurring and dissenting opinion in *Strickler v. Greene*, Justice Souter argued for precisely the shift in terminology that Maryland had been employing for almost a decade. He first identified the linguistic problem:

Before I get to the analysis of prejudice I should say something about the standard for identifying it, and about *the unfortunate phrasing of the shorthand version in which the standard is customarily couched.* The Court speaks in terms of the familiar, and perhaps familiarly deceptive, formulation: whether there is a "reasonable probability" of a different outcome if the evidence withheld had been disclosed. *The Court rightly cautions that the standard intended by these words does not require defendants to show that a different outcome would have been more likely than not* with the suppressed evidence.

527 U.S. at 297–98, 119 S.Ct. 1936 (emphasis supplied).

Justice Souter referred to the deceptive similarity between the phrase "reasonable probability" and the word "probability" as a linguistic source that simply cannot be ignored.

Despite our repeated explanation of the shorthand formulation in these words, *the continued use of the term "probability" raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, "more likely than not."* While any short phrases for what the cases are getting at will be "inevitably imprecise." *I think "significant possibility" would do better at capturing the degree to which the undisclosed evidence would place the actual result in question,* sufficient to warrant overturning a conviction or sentence.

527 U.S. at 298, 119 S.Ct. 1936 (emphasis supplied).

Justice Souter concluded:

We would be better off speaking of a "significant possibility" of a different result to characterize the *Brady* materiality standard.

527 U.S. at 300, 119 S.Ct. 1936. That is precisely what Maryland has done, albeit using "substantial possibility" instead of "significant possibility." That last equivalency is, indeed, a wash.

## Helpfulness and Materiality Compared

An observation is in order about the close relationship between *Brady's* helpfulness component and *Brady's* materiality component. There is a massive overlap, but they are not identical. All material evidence is contained within the larger category of helpful evidence. Evidence that is material is *per se* helpful. Any evidence that is not helpful cannot, by definition, be material. The evidence in issue in this case, for instance, is not material because it would not have been helpful.

On the other hand, evidence may be helpful even if it is not material. Such evidence is helpful, but not helpful enough. It moves in the right direction, but it fails to achieve materiality's critical mass.

## There Was No *Brady* Violation

None of the three *Brady* criteria was satisfied in this case. The impeachment of Leon Wilkerson's testimonial credibility would not have been helpful to the appellant, nor would the evidence in question have helped to discredit Leon Wilkerson's much earlier out-of-court statement to the police. By neither modality, therefore, would the evidence in question have been **HELPFUL.** Evidence of Leon Wilkerson's subjective expectation of leniency, moreover, was not **SUPPRESSED.** The evidence of activity that did not produce a pertinent expectation of leniency, furthermore, would not have been **MATERIAL.** For any of these reasons, there was no violation of *Brady v. Maryland.*

## A Body Attachment for Lloyd Jarrett

Turning to the other contentions, another of the witnesses against the appellant was Lloyd Jarrett. Jarrett testified on the second day of the trial and was subject to extensive direct examination, cross-examination, redirect examination, and recross-examination. In an effort to impeach Jarrett's credibility, appellant's counsel thoroughly explored the reasons Jarrett might have had for cooperating with the

State. It was revealed that Jarrett had prior convictions for 1) the distribution of narcotics and 2) escape. Jarrett admitted that he had violated his probation on the narcotics offense and had, on March 31, 2000, been placed on three years of probation. He was still on probation at the time of his testimony against the appellant. Jarrett also admitted to having been convicted of the unauthorized use of a motor vehicle in 1996 and of three cases of possession of narcotics with intent to distribute in 1992.

Jarrett further acknowledged that he had narcotics cases pending against him at the time of his testimony in this case. In terms of a motive to testify for the State in the expectation of leniency, Jarrett was thoroughly impeached. At the conclusion of his testimony Judge Allison quashed the writ and body attachment that had earlier been issued, and Jarrett was free to leave.

On the next trial day, appellant's counsel informed Judge Allison that he had, overnight, looked more closely at the docket entries involving Jarrett and had also spoken to defense counsel in another case in which Jarrett had been a State's witness. Appellant's counsel informed Judge Allison that he would like to recall Jarrett and to ask him some further questions. Judge Allison responded that she would permit Jarrett to be recalled. The appellant, however, did not request a subpoena for Jarrett. At the end of the case, Jarrett understandably had not appeared. The appellant then for the first time requested a body attachment.

Appellant's counsel explained to Judge Allison that he had not himself subpoenaed Jarrett because the prosecutor had informed him that if he wanted to recall Jarrett, it "would not be a problem." That could have meant the prosecutor would undertake to produce the witness. On the other hand, that could simply have meant that the prosecutor would not object to the recalling of the witness for further impeachment. The prosecutor stated, "I don't think I ever made any representation that somehow if he didn't want to come back or something came up, that we were going to undertake the effort to go searching for him."

In any event, Judge Allison declined to issue a new body attachment for Jarrett, observing that any additional inquiry into Jarrett's having testified in some other case would be both cumulative and collateral. Judge Allison indicated, however, that she would allow the appellant additional time to obtain Jarrett's appearance, but that she would not issue a second body attachment for him.

In addition to raising this issue on direct appeal as an alleged trial error, the appellant also raised it as one of the grounds supporting his Motion for a New Trial. Judge Allison's explanation, in that context, for her action in denying the new trial motion persuades us, in this context, that she did not abuse the wide discretion vested in the trial judge in regulating trial procedure, including the coming and going of witnesses.

The defendant's final ground for a new trial is that the Court erred in refusing to issue a body attachment for the return of Lloyd Jarrett at the defendant's request. *The defendant had an opportunity for cross examination of Mr. Jarrett and re-cross. At no time did the defendant indicate to the Court that Mr. Jarrett should not be excused. Nor did the defendant make any effort to subpoena Mr. Jarrett.* Accordingly, Mr. Jarrett's absence was of the defendant's making. More importantly, however, *the stated ground for requesting the Court to issue a body attachment for Mr. Jarrett was so the defendant could continue his impeachment of Mr. Jarrett.* The further impeachment involved a sentence imposed on Mr. Jarrett in October, 2000. *The failure of the defendant to be prepared with that impeachment material during his cross or re-cross of Mr. Jarrett is not grounds for the Court to seize Mr. Jarrett and return him to the courtroom to continue with a third round of impeachment.*

(Emphasis supplied). We see no abuse of discretion.

## Declining to Excuse a Juror

█ The murder victim was James Todd Piche. The stepfather of the victim, Rich Warfield, was present in the

courtroom as one of the spectators at the trial. When the prospective jurors were voir-dired, Rich Warfield's name was not included on any list of potential witnesses. He was not mentioned or identified in any way.

During the second day of trial, the jury forelady brought to the attention of the court a brief conversation she had had on a nearby street with an individual whom she recognized. She knew Rich Warfield because "he was a very good friend of my husband's growing up." When she said hello to him outside the courthouse, however, Mr. Warfield informed her that he should not be talking to her. Sensitive to any possible impropriety, she immediately brought this to the attention of the judge. The prosecutor informed the judge (but not the forelady) that Rich Warfield was, indeed, James Piche's stepfather, notwithstanding their different last names. Judge Allison then explored with the juror the possible impact of the recognition:

THE COURT: Okay. *Do you know a Rich or Jennifer Warfield?*

THE JUROR: *Yes, I do.*

THE COURT: Okay. Did you have some discussion with them at lunch?

THE JUROR: You know, *I saw him on the street and said, "Hi." I had no idea he was connected with this case.* All he said was, "I shouldn't be talking to you." ... I said, "Okay." That was our exchange.

THE COURT: Okay. And *do you know now whether he has any connection to this case?*

THE JUROR: *No, I don't.*—He was a very good friend of my husband's growing up. *He didn't recognize me, I don't think, but I recognized him,* but I had no idea that he had anything to do with this case.... Not that I was going to talk to him anyway....

THE COURT: Do I understand that you had no discussions about the case?

THE JUROR: None. None....

THE COURT: All right. Ma'am, do you feel that this exchange that you had with Mr. Warfield has in any way affected your ability to decide this case fairly and impartially based solely on the testimony that you hear in this courtroom?

THE JUROR: No. . . .

. . . Until right now I have no earthly idea he was in any way connected and now I'm thinking he is.

THE COURT: So if we hadn't made a big deal out of it—all right. Thank you ma'am.

(Emphasis supplied).

The appellant, we hold, makes too much of the recognition by a juror of a casual acquaintance. Rich Warfield had been a friend, albeit a close one, not of the juror herself, but of her husband. That friendship, moreover, was not an ongoing present relationship, but one rooted in the past. Although the juror recognized Rich Warfield, he apparently had not recognized her. The recognition, moreover, came on the street and not in the courtroom.

The appellant nonetheless moved to have the juror replaced. Judge Allison reserved her ruling. The next day she denied the motion, pointing out that the juror did not know, even then, that Rich Warfield was the parent (or stepparent) of the victim and that the juror had not discussed the case in any way with Mr. Warfield.

Judge Allison observed that Rich Warfield could have been in court for any number of reasons and that it was pure speculation that the juror would deduce Warfield's relationship with the victim. Even if one could speculate that Rich Warfield had some interest in the trial, the conclusion was by no means a compelling one that he necessarily had some interest in seeing the appellant convicted. He could have been a supportive friend of either the victim or the appellant. He could well have been a supportive friend or relative of either the defense attorney or the assistant states attorney. He could well have been a prospective employer of either

attorney, wishing to get a first-hand impression of trial skills. He could well have been a representative of a citizens' interest group, monitoring the trial process. He could well have been a friend of the judge, waiting to go to lunch. The list of possibilities could go on and on.[4]

This alleged trial error, now raised before us, was also raised before Judge Allison in the Motion for a New Trial. Her observations in that context we find persuasive in this context.

---

4. We take some umbrage, moreover, at the misleading manner in which the appellant has framed this issue.

> THE TRIAL COURT ERRED IN FAILING TO STRIKE THE JURY FOREPERSON, *WHO TOLD THE COURT THAT SHE KNEW THE VICTIM'S FAMILY, AND THAT THE VICTIM'S FATHER WAS A "VERY GOOD FRIEND OF MY HUSBAND'S."*

(Emphasis supplied).

The careful placement of the opening quotation mark may shield the statement from being literally false. It nonetheless attempts to convey to us a very false impression. We are not concerned that the reference to Rich Warfield as a "very good friend of my husband's" does connote more of a sense of contemporaneity than would a more accurate reference to the fact that Rich Warfield had been a "very good friend of my husband's growing up." Nor are we concerned with the subtle glide from "victim's stepfather" to "victim's father." That may be nothing more than editorial license.

We are concerned, however, that even an indirect quotation makes a deliberate statement: "The jury foreperson ... told the court that she knew the victim's family." The jury foreperson never told the court any such thing. The juror did not know the victim's family. The juror did not know the victim. The juror did not know that the victim even had a family, let alone that Rich Warfield was a member of that family. The indirect quotation went on: "The jury foreperson ... told the court ... that the victim's father was a 'very good friend of my husband's.'" That statement attributes to the juror knowledge that Rich Warfield was the "victim's father." The juror, however, expressly disavowed any such knowledge.

The initial statement of the contention was no accident of random phraseology. The appellant's argument picked up and reiterated the theme.

> *The trial court* deprived Appellant of a fair trial in contravention of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Articles 21 and 24 of the Maryland Declaration of Rights because it *refused to strike a juror who stated, during trial, that she recognized the victim's family and knew the father as "a good friend of my husbands."*

(Emphasis supplied).

The defendant's third ground for a new trial is that the Court erred in failing to dismiss the jury foreperson who returned from lunch and informed the Court that *she had seen, outside the courtroom, a good friend of her husband. She indicated that she had not seen this gentleman, Rich Warfield, in the courtroom. Although the defendant attempts to make it appear as though this juror knew that Mr. Warfield was family of the victim, the juror positively stated that she did not know why he was present.* Moreover, Mr. Warfield and the victim, James Piche, do not share the same surname. The juror definitively stated that the presence of Mr. Warfield in the courtroom would not impair her ability to be fair and impartial. Accordingly, there is no basis to grant a new trial on this ground. (Emphasis supplied).

A decision as to removing a juror for bias is entrusted to the broad discretion of the trial judge and an appellate court will not interfere with such an exercise of discretion except in cases of clear abuse. *State v. Cook,* 338 Md. 598, 607, 659 A.2d 1313 (1995); *Evans v. State,* 333 Md. 660, 673, 637 A.2d 117 (1994); *Hunt v. State,* 321 Md. 387, 415, 583 A.2d 218 (1990). Judge Allison did not clearly abuse her discretion in this case.[5]

---

**5.** The Supreme Court decision in *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), helps to place the strained allegation of juror bias in this case in realistic perspective. The defendant in that case, convicted of murder in New York City, later learned that one of his jurors, during the course of the trial, had submitted an application for employment as a major felony investigator to the District Attorney's Office. Word of the application filtered down to the prosecutors of the defendant's case, but they elected not to inform defense counsel or the judge of the employment application. A post-trial hearing found that the juror was nonetheless free of any actual bias in the defendant's case and denied post-conviction relief.

On a federal writ of habeas corpus, the District Court granted relief and the Second Circuit affirmed. In reversing the Second Circuit, Chief Justice Rehnquist wrote for the Supreme Court majority:

[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable.

455 U.S. at 217, 102 S.Ct. 940.

**444**

## And the Constitutional Right of Confrontation

█ As we have discussed at great length, one of the witnesses called by the State was Leon Wilkerson. In a taped statement, Wilkerson had earlier told the police that he had seen the appellant, whom he had known for many years, shoot the victim. At trial, however, Wilkerson repudiated that statement and testified that he did not know who the shooter was because the shooter was wearing a mask. The State invoked Maryland Rule 5–802.1(a) and played before the jury the earlier statement that Wilkerson had given to the police.

The appellant now claims, for the first time on appeal, that the playing of the tape violated his Sixth Amendment right to be confronted by the witnesses against him, as that right has recently been explicated by *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The short answer to the contention is that it has not been preserved for appellate review. At trial, the appellant's only objection to the playing of the tape was pursuant to Maryland Rule 5–802.1(a) and *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993). The exception to the rule against hearsay dealt with by that rule and that case does not implicate the confrontation clause. The contention is simply an opportunistic afterthought, and we decline to address it.[6] Maryland Rule 8–131(a).

---

6. Even if the contention had been preserved, it is unlikely that the appellant would have fared any better. Chief Judge Murphy made it clear for this Court in *Cooley v. State*, 157 Md.App. 101, 108–11, 849 A.2d 1026 (2004), *overruled on other grounds*, 385 Md. 165, 867 A.2d 1065 (2005), that prior inconsistent statements by "turncoat witnesses," given certain qualifying conditions, may be received as substantive evidence pursuant to Maryland Rule 5–802.1(a)(3) and *Nance v. State*, *supra*, with no impediment posed by *Crawford v. Washington* or the Confrontation Clause.

We will comment on the merits no further, however, out of deference to the non-preservation principle. When an issue is not preserved for appellate review (as this contention most assuredly was not), an appellate court should refrain from compromising the force of its non-preservation holding by commenting gratuitously on what its holding on the merits probably would have been if the contention had been

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.

---

preserved for appellate review.  Sometimes it is hard, however, not to pile Ossa upon Pelion.